**UNITED STATES, Appellee,**

v.

**Octavio FONT–RAMIREZ,
Defendant, Appellant.**

**No. 90–1809.**

United States Court of Appeals,
First Circuit.

Heard March 5, 1991.

Decided Sept. 11, 1991.

Frank Pola, Jr., Hato Rey, P.R., by appointment of the Court, for defendant, appellant.

Jorge E. Vega–Pacheco, Asst. U.S. Atty., with whom Charles E. Fitzwilliam, Acting U.S. Atty., San Juan, P.R., was on brief, for appellee.

Before TORRUELLA and SELYA, Circuit Judges, and BOYLE,* District Judge.

FRANCIS J. BOYLE, Chief Judge [1].

Octavio Font–Ramirez (Font–Ramirez), along with two co-defendants, was arrested in his mother's apartment after police noticed a number of bricks of cocaine flying out of windows during the execution of a search warrant. Font–Ramirez appeals his conviction on charges of possession with intent to distribute 27.6 kilograms of cocaine.

Font–Ramirez' conviction was based largely on the testimony of Roberto E. Bouret, a drug importer who, after his arrest on unrelated drug charges, agreed to cooperate with the Drug Enforcement Agency (D.E.A.) in exchange for the possibility of a lighter sentence. Bouret was released on bond on April 6, 1989 and began working for the D.E.A. as an informant.

According to Bouret, on July 19, 1989, he met twice with Font–Ramirez and two others who were later indicted and charged as co-defendants: Ramon Mejias Negron (Mejias) and Jose A. Adorno Merced (Adorno). The first of these meetings took place in a parking lot. Font–Ramirez parked his car and approached Bouret, telling him that he was looking for buyers for a recent cocaine shipment. Font–Ramirez allegedly told Bouret that the cocaine was part of a larger shipment that had been brought to Puerto Rico on a ship called the Carla "C".

After this meeting, Bouret reported the conversation to an agent of the D.E.A. who arranged for surveillance of Font–Ramirez' mother's apartment. The second meeting took place in this apartment. During the meeting, Font–Ramirez allegedly showed Bouret four kilograms of cocaine contaminated with diesel fuel in clear plastic bags on an ironing board in a back room of the apartment. Font–Ramirez also allegedly led Bouret to a closet where a number of sealed bricks of cocaine were hidden in a black plastic garbage bag. Bouret carried a concealed micro-cassette recorder during this second meeting, and recorded incriminating conversations with the defendants.

Police executed a search warrant at the apartment on the evening of July 19th. There was some delay in entering and securing the apartment. After knocking and announcing their presence in English and Spanish, police attempted unsuccessfully to break down the back door, which was reinforced with a steel bar. During the delay, two police officers posted at the front and rear of the building saw cocaine bricks

---

* Of the District of Rhode Island, sitting by designation.

1. Of the District of Rhode Island, sitting by designation.

being thrown from fifth floor windows on three sides of the apartment. Font–Ramirez, Mejias, and Adorno were arrested inside the apartment after police finally gained entry through the front door. Seized along with the cocaine were scales and a loaded .357 caliber Magnum revolver.

Font–Ramirez was indicted on July 26, 1989. After the district court granted a motion to sever the case of co-defendant Adorno, Font–Ramirez and Mejias were tried together in February, 1990. At trial, the police informant, Bouret, testified in detail about his conversations with the defendants at the apartment. Bouret also described how Font–Ramirez showed him cocaine in the two different locations in the apartment. Through Bouret, prosecutors authenticated the tape recording of Bouret's conversations with the defendants. The tape and a transcript of the tape prepared by Bouret were admitted into evidence.

The balance of the government's case consisted of testimony by police officers who executed the warrant. In particular, one officer testified that he saw defendant Adorno drop a plastic bag of cocaine from a balcony in the front of the apartment building. At about the same time, another officer saw bricks of cocaine being thrown from windows on the left and right sides of the apartment.

The jury found both defendants guilty. On August 8, 1990, Font–Ramirez was sentenced to 360 months imprisonment based on a guideline base offense level of thirty-four and a two point enhancement for the presence of a firearm in the apartment, a two point enhancement for obstruction of justice, and a two point enhancement for Font–Ramirez' alleged leadership role in the offense. This appeal followed.

The appeal rests on five grounds. First, appellant argues that the district court erred in failing to grant a motion for severance. Second, appellant asserts that his indictment should have been dismissed for prosecutorial misconduct. Third, appellant contends that the district court erred in admitting into evidence tape recorded conversations between appellant and a govern-

ment informant. Fourth, appellant argues that the Spanish transcript of the tape recording and its English translation should not have been given to the jury. Fifth and finally, Font–Ramirez contends that his sentence was improperly imposed in violation of the Sentencing Guidelines. For the reasons stated, we affirm the conviction and sentence.

*Motion to Sever*

■ Font–Ramirez first complains that his trial and conviction were unfair because of the district court's determination not to sever his case from that of his co-defendant, Mejias. In particular, Font–Ramirez argues that Mejias would have testified on his behalf if he had been able to do so without incriminating himself. By denying his motion to sever, Font–Ramirez contends that the district court denied him access to this exculpatory testimony.

■ The Federal Rules of Criminal Procedure permit the trial court to order separate trials of co-defendants as required in the interests of justice. Fed.R.Crim.P. 14; *see United States v. Palow,* 777 F.2d 52, 55 (1st Cir.1985), *cert. denied,* 475 U.S. 1052, 106 S.Ct. 1277, 89 L.Ed.2d 585 (1986). Because our review is under the abuse of discretion standard, reversal is warranted only where there is "a strong showing of prejudice." *United States v. Luciano Pacheco,* 794 F.2d 7, 8 (1st Cir.1986); *United States v. Bautista,* 731 F.2d 97, 100 (1st Cir.1984). In cases where a motion for severance is based on a professed need for a co-defendant's testimony, the moving party must demonstrate: "(1) a bona fide need for the testimony; (2) the substance of the testimony; (3) its exculpatory nature and effect; and (4) that the codefendant will in fact testify if the cases are severed." *United States v. Drougas,* 748 F.2d 8, 19 (1st Cir.1984).

■ In this case, Font–Ramirez filed an affidavit by co-defendant Mejias in support of his motion for severance. This affidavit asserted that Mejias was willing to testify and that his testimony would be beneficial to Font–Ramirez. The affidavit, however,

did not give the substance of the testimony and did not explain why the testimony was necessary or beneficial to the defense.[2] The Magistrate–Judge noted these deficiencies in a Report, accepted by the district court, that recommended denial of the motion to sever. This denial was obviously not an abuse of discretion.

### Motion to Dismiss the Indictment

■ In his second ground, Font–Ramirez argues that the district court erred in refusing to dismiss the indictment for prosecutorial misconduct. Although his brief is rather obscure, Font–Ramirez seems to argue that the prosecution's decision to seek an indictment based on hearsay evidence constituted misconduct. Appellant also asserts that the prosecution misportrayed Font–Ramirez' role in the offense by representing him as the owner of his mother's apartment.[3]

■ Dismissal of an indictment is an extreme remedy, appropriate only in cases of "serious and blatant prosecutorial misconduct that distorts the integrity of the judicial process." *United States v. Georgi*, 840 F.2d 1022, 1030 (1st Cir.1988) (quoting *United States v. Ogden*, 703 F.2d 629, 636 (1st Cir.1983)). Even where misconduct is present, post-conviction dismissal of an indictment is a rare event, in large part because the petit jury's verdict ordinarily cures any failings in the grand jury process. *See United States v. Rivera–Santiago*, 872 F.2d 1073, 1088 (1st Cir.), *cert. denied*, 492 U.S. 910, 109 S.Ct. 3227, 106 L.Ed.2d 576 (1989); *Porcaro v. United States*, 784 F.2d 38, 44 (1st Cir.), *cert. denied*, 479 U.S. 916, 107 S.Ct. 320, 93 L.Ed.2d 293 (1986).

Font–Ramirez' argument fails because there was no hint of government misconduct in the case. Hearsay evidence is a sufficient basis for an indictment. *Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956). There was no allegation or evidence that the hearsay testimony was misleading or otherwise warranted such an extreme remedy as dismissal of the indictment.

The witness' statement concerning Font–Ramirez' ownership of the apartment was, likewise, not misleading. Evidence at trial indicated that Font–Ramirez lived in the apartment whether or not his name was on the lease. The petit jury knew that the apartment belonged to Font–Ramirez' mother and found evidence sufficient to return a guilty verdict. Under these circumstances, appellant suffered no prejudice. The district court's decision not to dismiss the indictment was well within its discretion.

### Admission of the Tape Recording

■ In his third argument, Font–Ramirez takes issue with the trial court's decision to allow into evidence the tape recording of incriminating conversations among the informant Bouret and the three defendants. At trial, Font–Ramirez raised a general objection, arguing that the tape should not have been played to the jury because the portions of the tape containing the defendants' side of the conversations were unintelligible.

We review the district court's decision to admit the tape recording under the abuse of discretion standard. *United States v. Panzardi–Lespier*, 918 F.2d 313, 318 (1st

---

**2.** In his brief on appeal, Font–Ramirez asserts, for the first time, that Mr. Mejias would have testified that appellant was only peripherally involved in the drug importation and distribution, and that the loaded gun found in the apartment did not belong to appellant. This offer of the substance of Mejias' testimony is much too little, and much too late. It is too little because evidence that Mejias had a more extensive role in the offense hardly exculpates appellant. The evidence comes too late because this Court may not consider arguments or evidence not presented to the district court. *Matthews v. Marsh*, 755 F.2d 182, 183–84 (1st Cir.

1985); *see Fifteen Thousand Eight Hundred and Forty–Four Welfare Recipients v. King*, 610 F.2d 32, 35 n. 1 (1st Cir.1979).

**3.** Appellant also asserts that the government's questioning of one witness gave the grand jury the false impression that agents first tried to enter the apartment by the front door, when actually the agents tried to enter the apartment by the back door. Assuming the truth of this assertion, we fail to understand how this misapprehension could have prejudiced the grand jury.

Cir.1990); *United States v. Santana,* 898 F.2d 821, 823–24 (1st Cir.1990). The trial court has broad discretion in ruling on the admissibility of tape recordings, even where portions of tapes are unintelligible. *Panzardi–Lespier,* 918 F.2d at 318; *United States v. Bernal,* 884 F.2d 1518, 1523 (1st Cir.1989). In so ruling, the trial court must decide whether "the inaudible parts are so substantial as to make the rest more misleading than helpful." *United States v. Carbone,* 798 F.2d 21, 24 (1st Cir.1986) (quoting *Gorin v. United States,* 313 F.2d 641, 652 (1st Cir.), *cert. denied,* 374 U.S. 829, 83 S.Ct. 1870, 10 L.Ed.2d 1052 (1963)). We find that the admission of the evidence was not an abuse of discretion.

Large portions of the tape, including statements by the defendants, are audible. Furthermore, Bouret authenticated the tape and identified the defendants' voices. As a result, the tape is helpful because it places Bouret and the defendants together in the apartment, corroborating Bouret's direct testimony.

 Appellant's argument also fails because it rests upon a general objection to the audibility of the tape as a whole. After the government lays a foundation for the admission of a tape, the party challenging the recording bears the burden of showing that it is inaccurate. *Id.; United States v. Rengifo,* 789 F.2d 975, 978 (1st Cir.1986). The preferable method for challenging the tape is through a pre-trial suppression hearing. The government gave each defendant a copy of the tape well before trial and Font–Ramirez chose not to challenge the tape prior to trial. Under these circumstances, it was reasonable for the trial court to admit the tape and to entertain specific objections as the tape was played. *Carbone,* 798 F.2d at 25. Font–Ramirez raised no specific objections at trial and, similarly, raises only a general objection on appeal. Such a general objection, in circumstances where a tape is partially audible, is insufficient to highlight misleading or inaccurate portions of the tape.

 Appellant's brief mentions several miscellaneous objections to the tape's admissibility. Font–Ramirez misconstrues the scope of 18 U.S.C. § 2511 in arguing that the tape was illegally obtained because prior approval for the recording was not given by the Justice Department. The statute permits taping of conversations without approval if a person who is a party to the conversation gives prior consent to the recording. 18 U.S.C. § 2511(2)(c) (1988). There is no question that Bouret agreed to carry the tape recorder and to record the conversation.

 Font–Ramirez next argues that the tape should have been denied admission because it merely repeated Bouret's direct testimony. The fact that the tape lended credibility to Bouret's testimony was, of course, the reason why the government sought its admission. That evidence is cumulative has never been a bar to its admissibility.

Lastly, Font–Ramirez argues, cryptically, that the government failed to prove that the tape recorder was working properly at the time that the conversations were recorded. The tape itself is irrebuttable evidence of the flaw in this argument. In sum, the trial court did not abuse its discretion in deciding to admit the tape into evidence.

### Admission of the Transcript

 The admission of the government's transcript into evidence poses a slightly more difficult problem. The tape was transcribed by Bouret, the government informant, several months before trial. Long before trial, the government provided defense counsel with a copy of the Spanish transcript, an English translation of the transcript, and a copy of the tape. Font–Ramirez raised no objection at all to the transcript before the trial. At trial, Font–Ramirez learned for the first time that it was Bouret who transcribed the tape. Apparently fearing that the transcript was tainted by possible bias in the transcription process, Font–Ramirez raised a general objection to its accuracy, but did not point to any specific inaccuracies. Over his objec-

tion, the district court let the jury use both the Spanish and English [4] transcripts.

In this appeal, Font–Ramirez argues that the trial court erred in admitting the transcript which, he asserts, purported to transcribe passages that were unintelligible on the tape. Font–Ramirez also argues that the admission was error because the tape was transcribed by Bouret, who may have filled in inaudible portions of the tape with his memories of the conversations. Font–Ramirez asserts that these inaccuracies in the transcript were accentuated because one juror did not understand Spanish and, as a result, relied exclusively on the English translation of Bouret's transcript as evidence of the conversations.

■ As with the admission of tapes, the use of transcripts to assist the jury is committed to the sound discretion of the trial judge. *United States v. Rengifo,* 789 F.2d 975, 980 (1st Cir.1986); *see United States v. Panzardi–Lespier,* 918 F.2d 313, 318–19 (1st Cir.1990) (trial court's decision denying admission of government transcript not an abuse of discretion); *United States v. Campbell,* 874 F.2d 838, 850 (1st Cir.1989) (not an abuse of discretion to admit government's transcript instead of defendant's transcript). It is advisable for a trial judge to obtain a stipulated transcript, or if agreement is lacking, to rule on the admissibility of a transcript before the start of trial. *Rengifo,* 789 F.2d at 983. This suggestion, however, presupposes a timely objection to a transcript by one of the parties. Where, as in the present case, a defendant has possession of the transcript and tape prior to trial and raises no pretrial objection, the district court is not obliged to interrupt the trial to screen the transcript for accuracy prior to its use by the jury. *United States v. Carbone,* 798 F.2d 21, 26 (1st Cir.1986); *United States v. Mazza,* 792 F.2d 1210, 1226 (1st Cir.1986), *cert. denied,* 479 U.S. 1086, 107 S.Ct. 1290, 94 L.Ed.2d 147 (1987). Instead, as with any other evidence, the district court can listen to the tape as it is played to the jury, following

the transcript and ruling on specific objections as they arise. See *Carbone,* 798 F.2d at 26.

The district court followed this procedure. Font–Ramirez raised no specific objections as the tape was played, effectively presenting the district court with a Hobson's choice, either to admit the entire transcript or to exclude it. Under the circumstances, we find that the district court's decision to allow use of the transcript was not an abuse of discretion.

■ The objectivity of the transcriber of a tape obviously bears on the decision whether or not to admit a transcript into evidence. The tape recording and not the transcript is evidence in the case. The transcript should, therefore, mirror the tape and should not be an amalgam of the recording and the hearsay testimony of persons present at the conversation. Where inaccuracies in the transcript combine with possible bias in the transcription process, a transcript may be excluded from evidence. See *United States v. Robinson,* 707 F.2d 872, 877–78 (6th Cir.1983). The touchstone, however, is the accuracy of the transcript. Because Font–Ramirez did not offer an alternative transcript and did not point out any specific inaccuracies in the government's transcript, the district court was within its discretion in allowing its use. See *United States v. Devous,* 764 F.2d 1349, 1355 (10th Cir.1985).

■ The fact that one juror understood no Spanish and relied solely on the transcript does not change our conclusion. The jurors were properly instructed that the tape was the actual evidence in the case, and that the transcript was merely introduced as an aid in understanding the tape. This instruction served to warn the jury that the transcript might contain inaccuracies. The jury was made aware of the strengths and flaws of the transcription process both during Bouret's authentication of the transcript and during the defendants' cross examination of Bouret. The jury, therefore, had an adequate basis for

**4.** Font–Ramirez disputes the accuracy of the English translation because it was based entirely on Bouret's Spanish transcript. Font–Ra-

mirez does not dispute the accuracy of the translation process, which was completed by a certified court translator.

assessing the reliability of the transcript, even without the benefit of the tape recording as a benchmark.

■ It is permissible to allow an English language jury to evaluate evidence of a tape recorded conversation in Spanish solely through use of a properly authenticated English language transcript. In *United States v. Rengifo,* 789 F.2d 975, 983 (1st Cir.1986), this Court held that a district court did not abuse its discretion by permitting the government to present taped Spanish conversations through the use of readers who read English translation transcripts into evidence. This procedure was acceptable in view of the fact that the *Rengifo* jury was comprised entirely of jurors who understood no Spanish. *See also United States v. Cruz,* 765 F.2d 1020, 1024 (11th Cir.1985) (permitting an English language jury to consider translated transcripts as substantive evidence).

In short, Font–Ramirez cannot validly complain that one juror out of twelve necessarily relied on the Bouret transcript. The transcript was properly authenticated. In failing to submit an alternative transcript or to raise specific objections, Font–Ramirez lost the opportunity to effectively contest its admission.

### Application of the Guidelines

Font–Ramirez appeals three two-point enhancements of the base offense level used to determine his sentence.[5] Font–Ramirez' base offense level under the Sentencing Guidelines was thirty-four. He received a two-point enhancement for possession of a firearm during the commission of an offense. His role as an "organizer; leader, manager, or supervisor" in the drug distribution cost him another two-point enhancement. Finally, because the district

court found that he had obstructed justice in attempting to hide or destroy cocaine at the time of the execution of the search warrant, his offense level was increased by an additional two points to a total of forty. On August 8, 1990, after entering Font–Ramirez' criminal history category into the calculus, the district court sentenced Font–Ramirez to imprisonment for 360 months, the minimum sentence permitted under the guidelines.

■ The district court's sentencing enhancements involved questions of fact. Font–Ramirez, therefore, has the burden to establish on appeal that the court's determinations were clearly erroneous. *United States v. Diaz–Villafane,* 874 F.2d 43, 48 (1st Cir.), *cert. denied,* 493 U.S. 862, 110 S.Ct. 177, 107 L.Ed.2d 133 (1989). At the sentencing, the government had the burden of proving, by a preponderance of the evidence, facts sufficient to support the sentencing enhancements. *United States v. Bianco,* 922 F.2d 910, 913 (1st Cir.1991). We, therefore, look to see if the court's conclusions were supported by a preponderance of the evidence, bearing in mind that "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

■ Font–Ramirez first complains that the district court erred in enhancing his offense level for his possession of a firearm during the commission of the offense. There is no dispute that police recovered a loaded pistol and a quantity of drugs from Font–Ramirez' residence. The gist of Font–Ramirez' argument seems to be that his enhancement for firearm possession creates an "unjustifiably wide" sentencing disparity between his sentence and that of

---

5. The Sentencing Guidelines are applied in a seven step process. The district court: (1) ascertains the statute of conviction; then (2) determines the corresponding "base offense level;" then (3) computes a "total offense level" by taking into account specified sentencing enhancements; then (4) ascertains the defendant's criminal history category; then (5) uses a grid that references the offense level against the criminal history category to determine the "sentencing range;" then (6) considers permissible upward or downward departures from the sentencing range; then (7) pronounces sentence. *United States v. Diaz–Villafane,* 874 F.2d 43, 47–48 (1st Cir.), *cert. denied,* 493 U.S. 862, 110 S.Ct. 177, 107 L.Ed.2d 133 (1989).

his co-defendants, whose sentences were not similarly enhanced. Font–Ramirez argues that this sentencing disparity runs counter to one of the prime purposes of the sentencing guidelines, the fostering of uniform sentencing for similarly situated defendants. *See* Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest,* 17 Hofstra L.Rev. 1, 4–5 (1988).

■ The difficulty with this argument is that Font–Ramirez and the other two co-conspirators were not similarly situated. Font–Ramirez, unlike his partners in crime, lived in the apartment. This fact permitted the district court to conclude, reasonably, that Font–Ramirez was in constructive possession of the gun, whether or not he owned it. The guidelines are designed to punish co-defendants differently, in accord with their differing roles in the offense. *United States v. Parker,* 912 F.2d 156, 158 (6th Cir.1990). The guidelines do not require the sentencing court to consider related cases or to justify a sentence in terms of the punishment meted out to co-defendants. *United States v. Wogan,* 938 F.2d 1446, 1448–49 (1st Cir.1991); *United States v. Enriquez–Munoz,* 906 F.2d 1356, 1360 (9th Cir.1990); *United States v. Trujillo,* 906 F.2d 1456, 1463 (10th Cir.1990), *cert. denied,* ── U.S. ──, 111 S.Ct. 396, 112 L.Ed.2d 405 (1990). This argument fails.

■ In his second objection, Font–Ramirez argues that the district court incorrectly characterized him as an "organizer, leader, manager, or supervisor" of the drug operation and, as a result, incorrectly enhanced his sentence. Evidence established that the conspirators were in Font–Ramirez' car at the time of the first meeting with Bouret. The second meeting took place in Font–Ramirez' apartment. The tape recording of the second meeting documents that Font–Ramirez led Bouret into the back room of the apartment and showed him the drugs. Font–Ramirez also proposed a selling price for the cocaine and discussed arrangements for meeting with possible buyers. In short, ample evidence supported the district court's conclusion that Font–Ramirez was a leader or organizer of the drug operation.

■ In his last argument, Font–Ramirez asserts that the district court erred in adjusting his base offense level two points for obstructing justice by destroying evidence. Font–Ramirez argues that although material evidence was tossed out of the windows of his apartment during the police raid, he was not the one who did the tossing. It is true that only one defendant, Jose Adorno Merced, was seen throwing drugs from the apartment, specifically from a balcony on the south side of the apartment. At roughly the same time, however, bricks of cocaine were thrown from windows on the east and west sides of the apartment. Adorno could not have been in three places at once. It was reasonable for the district court to conclude that others must have joined Adorno in disposing of evidence. Given that Font–Ramirez was a leader in the drug operation and that only the three co-defendants were in the apartment at the time of the raid, it was permissible for the district court to conclude that Font–Ramirez took an active part in destroying or concealing evidence. The district court's conclusion is not clearly erroneous and Font–Ramirez' argument must fail.

Reaching the end of Font–Ramirez' objections, and finding them meritless, we affirm the conviction and sentence.

*Affirmed.*