**UNITED STATES of America, Appellee,**

v.

**Albert A. CORTELLESSO, Defendant, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Ralph ALTIERI, Defendant, Appellant.**

**Nos. 80–1728, 80–1729.**

United States Court of Appeals, First Circuit.

Argued Sept. 10, 1981.

Decided Nov. 9, 1981.

John Tramonti, Jr., Providence, R.I., for appellants.

Robert J. Erickson, U. S. Dept. of Justice, Washington, D. C., with whom Paul F. Murray, U. S. Atty. and Edwin J. Gale, Sp. Atty., U. S. Dept. of Justice, Providence, R. I., were on brief, for appellee.

Before ALDRICH, CAMPBELL and BOWNES, Circuit Judges.

ALDRICH, Senior Circuit Judge.

After remand, following our decision in *United States v. Cortellesso*, 1 Cir., 1979, 601 F.2d 28, *cert. denied*, 444 U.S. 1072, 100 S.Ct. 1016, 62 L.Ed.2d 753, reversing the district court's order that suppressed the fruits of allegedly illegal searches, defendants Cortellesso, and Altieri, his son-in-law, were jointly convicted of conspiracy to receive, transport, possess, and conceal stolen property, 18 U.S.C. § 371 (Count I), and of receiving and concealing stolen property, 18 U.S.C. § 2315 (Count III), and defendant Cortellesso, alone, was convicted of possessing stolen goods in violation of 18 U.S.C. § 659 (Count II), and of removing evidence to prevent its seizure in violation of 18 U.S.C. § 2232 (Count IV). The property consisted principally of men's luxury clothing, Cortellesso being the proprietor of a men's clothing store in Providence, Rhode Island. Cortellesso received concurrent seven-year sentences on Counts II and III, to be served, and a consecutive sentence of one year, suspended, on Count IV, and was fined $10,000 on Count I and $5,000 on Count II. Altieri received a one-year suspended sentence.

Both defendants appeal. Cortellesso contends he was unconstitutionally denied counsel of his choice.[1] Altieri claims the evidence against him was insufficient to convict. Both argue that certain tape recordings were improperly admitted. Finding these contentions without merit, we affirm.

*Cortellesso—Counsel*

The basis for Count IV was that, following one of the searches and discovery of a large amount of allegedly stolen clothing in defendant Cortellesso's cellar, his attorney, a Mr. Jackvony, alleged orally agreed that defendant would not remove the clothing, and that it would remain there until the government arranged for proper storage that would protect it from injury. When the government agents returned two days later, the clothing was gone. Defendants' brief thrice flatly states, we can only think meretriciously, that Jackvony did make this agreement—including a statement that the government's "case closed with a stipulation that former defense counsel [Jackvony], a Government Attorney, and [F.B.I.] Agent Kennedy had all agreed that the goods would remain in the basement. . . ." However, this is strikingly untrue. The only stipulation (which was read to the jury in lieu of his taking the stand) was to the effect that, if called to testify, Jackvony would testify to having made the agreement. The difference, of course, was that the government still had the burden of proving the fact. Even this stipulation was obtained only as a result of the court's ordering Jackvony's removal from the case as counsel for defendant (over defendant's unpardonably protracted objection by way of repeated motions for reconsideration), because of the government's need to use him as a witness. Cortellesso contends that Jackvony's removal was unnecessary, and hence a violation of his sixth amendment right to counsel of his choice.

1. Although it is now joined in by Altieri, the issue of the right to counsel of one's choice was principally raised by Cortellesso, who claimed his desired attorney had represented him for ten years. There was a separate question in the court's mind, which we might share, whether it could permit Cortellesso and Altieri to be represented at trial by the same counsel in any event. We confine our discussion of this issue to Cortellesso who was the one affected by counsel's alleged agreement, *see* post. If Mr. Jackvony could not represent Cortellesso, clearly he could not appear in the case at all without causing serious problems.

If Jackvony were to remain in the case, there were two alternatives: that he be called as a witness, or that he not be called. Clearly, the first alternative would have been improper. The grand jury record, which Jackvony never disclaimed, showed that he would testify against his client on an issue fundamental to the government's case. This, as the court pointed out, would create an impossible situation,[2] the impropriety of which is well settled and requires no discussion. *E.g.,* ABA Code of Professional Responsibility, DR 5–101(B); *United States v. Crockett,* 5 Cir., 1975, 506 F.2d 759, 761, *cert. denied,* 423 U.S. 824, 96 S.Ct. 37, 46 L.Ed.2d 40; *In re Rappaport,* 2 Cir., 1977, 558 F.2d 87, 90–91. While in oral argument defendant talked about his waiving any objection to Jackvony's dual and conflicting roles—not that we could recognize a waiver that would produce such a deformity—in the court below there was no suggestion of waiver, or of adopting such a procedure. Rather, the second alternative, only, was advanced, squarely and simply.

"THE COURT: Well, do you suggest that that means that because others who may have been involved in the conversation can testify to what in fact occurred during the conversation, that the Government can't call the witness who made the statements and, meaning no disrespect, get it directly from the horse's mouth?

"MR. JACKVONY: Yes, that is correct, your Honor. I say that if they can get it from other sources, that they cannot use me as a witness, and I say that . . . [t]he agents are available, your Honor."

The government was not required to accede to this truncation of its evidence. We do not accept the dictum in *United States v. Crockett,* ante, 506 F.2d at 760, that the government must show that the evidence is "unobtainable from other sources," if it means that the government must settle for less than its best evidence.

As the instant court pointed out, the government agents could be said to be vulnerable, as interested witnesses. Jackvony, on the other hand, from the government's standpoint was a clincher; defendant's only hope to win on this substantive issue would be to have him not testify. His absence would have two consequences. Not only would it weaken the government's case directly by a serious diminution of the total evidence, it would create a singular question in the jurors' minds—how was it that Jackvony, the most significant witness, had not testified? If the court explained that he could not testify because he was counsel, what inference, since he was defending the defendant against the charge and arguing that it was not to be believed, might the jury draw as to what he would have testified to if only he had been allowed the opportunity?

For the government, this would be a no-win situation; the defendant would have everything to gain, possibly including a most improper inference, and nothing to lose. "An accused's right to select his own counsel . . . cannot be insisted upon or manipulated so as to obstruct the orderly procedure in the courts or to interfere with the fair administration of justice." *United States v. Bentvena,* 2 Cir., 1963, 319 F.2d 916, 936, *cert. denied,* 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271; *cf. Rolon Marxuach v. United States,* 1 Cir., 1968, 398 F.2d 548, 551. It is inconceivable that defendant's right to a particular counsel should be permitted to impose these artificial disadvantages upon the government.

Nor does Cortellesso's position in any degree excite our sympathy; the court's ruling imposed a minimum hardship. In his brief, defendant states that the agreement issue was "a matter about which there was little dispute." If he considered the dispute small (more exactly, of course, there was no dispute in the real sense, where even his own attorney's evidence agreed with the government's), there would be a corre-

---

2. ". . . very serious prejudice would come to Mr. Cortellesso in that Mr. Jackvony would be required to argue to a jury before whom he testified, something quite contrary to what apparently he would be required to testify to at the trial."

spondingly small loss for defendant to give it up. He had but to accept the smallness, or , rather, lack of dispute, and stipulate that the agreement was made, and Jackvony's testimony would not be needed; the whole counsel-witness issue would disappear, and Jackvony would be free to continue in the case and combat the issues where the real dispute was.

While defendant would make much of the fact that Jackvony in fact did not testify, it seems obvious that if he had not been removed from the case, and subpoenaed as a witness, the stipulation as to his testimony would never have been obtained. Under these circumstances we may suspect defendant's insistent adhering to his position, and must wonder whether his real concern was to preserve a point for appeal. But whether this be so or not, the point lacks all merit.

### Altieri

■ With respect to Altieri's motion for acquittal, viewing the evidence in the light most favorable to the government, there was ample to support the verdict. It appeared that the clothing arrived in suitcases, and in a number of respects not in the normal course; that Altieri telephoned Cortellesso and told him "[t]hose packages came in" and asked where to put them; that Cortellesso directed him to put them in a dressing room and not to open them until the store was empty; that after opening them defendant described the contents to Cortellesso over the telephone in a manner indicating that Cortellesso was without prior knowledge thereof, although on the papers Cortellesso was both the shipper and consignee; and that Cortellesso showed a marked confusion as to how much he would have to pay, which Altieri, laughing, cleared up. An inference of guilty knowledge on Altieri's part and of conspiracy to receive, possess, and conceal was fully warranted.

### The Tapes

■ There is no merit in the appeal from the court's finding that the government had established an adequate foundation for the admission of tape recordings of court-authorized electrically intercepted telephone conversations. Agent Kennedy described in detail the procedure followed by the FBI with respect to the intercepts, which were conducted under his supervision. He further testified to his presence at the initial test of the equipment, which operated automatically; to his personal preparation of the transcripts from the tapes; to his custody of the original logs and tape recordings; and to the voice identifications. This last, appellants do not contest.

The government had done more than enough to raise the "presumption of official regularity." *United States v. Luna*, 1 Cir., 1978, 585 F.2d 1, 6, *cert. denied*, 439 U.S. 852, 99 S.Ct. 160, 58 L.Ed.2d 157. With this much of a showing it was not necessary that the agents who did the actual monitoring of the calls take the stand to confirm that they followed Kennedy's instructions, and to deny tampering with the tapes. We are not blind to the susceptibility of tape recordings to "sinister forces," even within the federal government, *cf. United States v. Haldeman*, D.C. Cir., 1976, 559 F.2d 31, 108–09, *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250. However, the government made out a prima facie case, by clear and convincing evidence, that the tapes were what it said they were. *E.g., United States v. Scully*, 9 Cir., 1976, 546 F.2d 255, 269, *vacated in part on other gr'ds*, 430 U.S. 902, 97 S.Ct. 1168, 50 L.Ed.2d 578; *United States v. Blakey*, 7 Cir., 1979, 607 F.2d 779, 787. If appellants really suspected tampering (which seems belied by counsel's statement below that "defendant Cortellesso has no dispute as to the accuracy of the narrative transcribed"), they could have engaged an expert to examine the tapes and rebut the government's proof. *United States v. Fuentes*, 2 Cir., 1977, 563 F.2d 527, 532, *cert. denied*, 434 U.S. 959, 98 S.Ct. 491, 54 L.Ed.2d 320. The tapes are not inadmissible merely because "one can conjure up hypothetical possibilities that tampering occurred." *United States v. Haldeman*, ante, 559 F.2d at 109; *see, e.g., United States v. Luna*, ante. The decision to admit them into evidence is reversible only if the district court abused its discretion. It did not.

*Affirmed.*