**UNITED STATES of America,**

v.

**Eric MILLAN, et al., Defendants.**

**No. S9 91 Cr. 685 (SWK).**

United States District Court,
S.D. New York.

March 29, 1993.

---

**1074**

Roger S. Hayes, acting U.S. Atty. by Dietrich L. Snell, Roland G. Riopelle, Asst. U.S. Attys., S.D.N.Y., New York City, for U.S.

Benjamin Brafman, New York City, for defendant Vincent Basciano.

Maurice H. Sercarz, New York City, for defendant Alfred Bottone.

David Breitbart, New York City, for defendant Alfred Bottone, Jr.

Gerald LaBush, New York City, for defendant Anthony Bottone.

Mitchell Golub, Golub & Dunn, New York City, for defendant Noel Melendez.

Anthony Cueto, New York City, for defendant John O'Rourke.

David Richman, New York City, for defendant Ralph Rivera.

Kenneth D. Wasserman, New York City, for defendant Samanta Torres.

James C. Neville, Harwood & Neville, New York City, for defendant Larry Weinstein.

### ORDER

KRAM, District Judge.

Defendants in this case stand charged, by a ninth superseding indictment filed on October 6, 1992, with conspiracy to distribute and possess heroin between January 1, 1986 and October 6, 1992 in violation of 21 U.S.C.

§§ 812, 841(a)(1) and 841(b)(1)(A). The indictment also charges various defendants with substantive narcotics trafficking offenses, the unlawful possession and use of firearms in relation to the heroin conspiracy, and engaging in "a continuing criminal enterprise" in violation of 21 U.S.C. § 848(a). On March 12, 1993, the Court learned that three agents involved in the investigation of the above-captioned case had been arrested for narcotics trafficking. Thereafter, the defendants submitted numerous motions, discussed below, which primarily seek the following relief: (1) suppression of the original wiretap order and all fruits thereof; (2) disclosure of all Government materials regarding the investigation of the three agents' misconduct; (3) dismissal of the indictment as to defendant Noel Melendez ("Melendez"); (4) appointment of a Special Prosecutor to investigate potential criminal conduct by law enforcement personnel; and (5) staying further proceedings in this case until the Special Prosecutor is appointed and completes the preliminary stages of his or her investigation. The Government opposes these motions and moves for two rulings *in limine*. Specifically, the Government seeks an order (1) permitting the introduction into evidence of all wiretap tapes through the testimony of two summary witnesses; and (2) precluding defense counsel from conducting any cross-examination or presenting any evidence regarding the arrests of the three agents.

## BACKGROUND

On March 2, 1993, one week prior to the Government's opening statement in the above-captioned case, a Complaint was filed charging New York State Police Detective Jeffrey Beck ("Beck"), Sergeant Joseph Termini ("Termini") and Investigator Robert Robles ("Robles"), three of the agents involved in the *Millan* investigation, with conspiring to distribute approximately four ounces of heroin.

On March 12, 1993, three days after the start of opening statements, the Government notified the Court that Beck, Termini and Robles had been arrested on narcotics trafficking charges. Thereafter, defense counsel moved in open court to dismiss the indictment on the grounds of prosecutorial misconduct.

On March 17, 19 and 22, 1993, the Government submitted three letters in opposition to defendants' application. The Government also requested *in limine* rulings that would (1) permit the introduction of all wiretap evidence through summary witnesses; and (2) preclude defense counsel from conducting any cross-examination or presenting any evidence regarding the three arrests.

In support of its application, the Government provided the Court, under seal, with the affirmation of Assistant United States Attorney David Fein, dated March 17, 1993 (the "Fein Aff."), which detailed the extent and nature of the ongoing investigation by the Internal Affairs Division (the "IAD"), into certain allegations of misconduct by past and present members of the New York Drug Enforcement Task Force (the "NYDETF"), and the affirmation of Assistant United States Attorney Dietrich L. Snell, dated March 17, 1993 (the "Snell Aff."), regarding the roles played by the agents in the *Millan* case.

Specifically, the Fein Aff. alleges that on or about December 3, 1992, Agents Beck and Termini provided a confidential informant with approximately four ounces of heroin for the informant to sell. During the next three months, numerous telephone conversations allegedly occurred regarding attempts by the informant to sell the narcotics and efforts by Beck and Termini to obtain approximately $25,000 in exchange for the drugs. On December 12, 1992, Robles is purported to have appeared on behalf of Beck and Termini to obtain money from the informant, although he was not paid at that time. The affirmation further alleges that the criminal activity cited in the Complaint was part of a continuing pattern of crime, including: theft of jewelry from a nondrug vault at the Drug Enforcement Administration (the "DEA"); a conspiracy to rob a subject of a money laundering investigation; a conspiracy to rob a suspected drug trafficker; and a conspiracy to burglarize locations associated with narcotics traffickers. The Fein Aff. also indicates, however, that all of the illegal conduct

occurred within the past twelve to eighteen months, after the arrests in the case at hand.

The Snell Aff. indicates that Robles made five undercover heroin buys in an investigation that proceeded the instant case—buys which ultimately formed the basis for the Government's wiretap. The buys occurred on October 29, November 2, November 28, December 20, 1990, and January 31, 1991. The Snell Aff. also indicates that all of the investigative actions, including the undercover buys, of Agent Robles were corroborated by surveillance agents. The affirmation also recounts Robles's involvement as a monitoring agent in the plant where the telephone conversations were intercepted pursuant to court authorized wiretaps. It further indicates that on August 1, 1991, Robles was assigned to a team of NYDETF and DEA agents who executed a search warrant at 324 Alexander Avenue, Apartment 3F, Bronx, New York; Detective Beck participated in the arrest of defendant Carlos Rivera, the seizure of his vehicle, and the search of 71–40 160th Street, Apartment 2–Front, Queens, New York; and Detective Termini participated in the execution of a search warrant at 110 Baruch Drive, Apartment 1D, New York, New York.

On March 19, 1993, following an *ex parte* application by the Government, the Court issued an order requiring the dissemination to defendants and their counsel of the entire Snell Aff. and a redacted version of the Fein Aff., which contained sensitive information about the ongoing Robles investigation. At the Government's request, additional redactions of the Fein Aff. were permitted by a Modified Order, dated March 19, 1993. Both the Snell Aff. and redacted Fein Aff. were subsequently distributed to defense counsel.

On March 23 and 24, 1993, the Court conducted an evidentiary hearing to determine the duration and extent of any police misconduct by agent Robles. At the hearing, defendants produced two witnesses, Joseph Serrano ("Serrano") and Rafael Abecasis ("Abecasis"). Serrano testified that he engaged in extensive criminal activity with Robles and Termini, including: (1) "fencing" stolen diamonds, gold and jewelry; (2) burglarizing a storage area; (3) impersonating a police officer; (4) surveillance of "stash houses" for potential burglarizing; and (6) an illegal car stop to steal money from a suspected drug dealer. Serrano also testified, however, that his criminal involvement with Robles began sometime in the past eighteen months. Serrano's statements were contradicted, in part, by Abecasis, a confidential informant, who testified that Serrano told him that (1) ten to fifteen agents were involved in criminal misconduct; (2) the illegal activities with Robles spanned a three to five year period; and (3) Robles threatened to kill Serrano if he talked.

The defendants now move for an order: (1) suppressing the original wiretap order and all fruits thereof on the grounds that the order was issued without probable cause[1]; (2) disclosing to defense counsel all evidence regarding the Robles/Beck/Termini investigation; (3) dismissing the indictment as to defendant Noel Melendez; (4) appointing a Special Prosecutor to investigate the criminal conduct by agents of the Task Force; and (5) staying these proceedings in order to provide the Special Prosecutor with time to complete the preliminary stages of his or her investigation. The Government opposes these motions and requests an order *in limine* (1) permitting the introduction of the wiretaps without Robles's testimony; and (2) precluding the defendants from cross-examining any witness regarding the Robles/Beck/Termini investigation.

## DISCUSSION

### I. *Motion to Suppress the Wiretap Tapes*

On January 28, 1991, this Court entered an order authorizing the interception of communications over telephone number (212) 847–2859, a cellular telephone previously identified by the NYDETF as being used by a

---

1. Although defendants have not at this time specifically moved to suppress all wiretap evidence and the original wiretap order, by letter dated March 26, 1993, the defendants indicated that such a motion was likely after further discovery.

*See* Letter from Maurice H. Sercarz to the Honorable Shirley Wohl Kram, dated 3/26/93, at 3–4. Accordingly, having reviewed the discovery requested, the Court, in the interest of judicial economy, will address this motion at this time.

member of the charged heroin conspiracy, Jose Colon. Interception of communications over telephone (212) 847–2859 commenced on January 30, 1991 and concluded on March 1, 1991.[2]

The January 28, 1991 Order was issued on the basis of the thirty-three page Affidavit of Special Agent Dongilli, dated January 28, 1991 (the "Dongilli Aff."). The probable cause section of the Dongilli Aff. was based, in part, on five undercover buys of heroin by NYDETF member, Robert Robles, which occurred on October 29, November 2, November 28, December 20, 1990, and January 31, 1991. *See* Dongilli Aff. at ¶¶ 27, 28, 34, 36.

### A. Probable Cause

■ The defendants move to suppress the original January 28, 1991 wiretap order as not supported by probable cause. Defendants challenge the veracity and credibility of Dongilli's sworn statement, specifically, the proof regarding the undercover buys in which Robles participated. In light of the subsequent arrests of Robles, Beck and Termini, defendants maintain that the January 28, 1991 Order must be suppressed as the issuing judge relied upon the now suspect undercover purchases of heroin to find probable cause. *See* Letter of Benjamin Brafman, to the Honorable Shirley Wohl Kram, dated 3/17/93, at 7. Defendants argue further that Robles actually monitored various conversations and drew certain conclusions that were incorporated into other affidavits to obtain additional warrants. Accordingly, the defendants argue that all the warrants in this case may well be infected. *Id.*

In response, the Government contends that not only do the allegations of misconduct relate to events that occurred long after the wiretap phase of the *Millan* investigation, but also, (1) the investigative actions of Robles were corroborated by the observations and actions of other members of the NYDETF; and (2) the allegations against Ro-

bles do not involve the validity of the Title III orders or their execution and do not suggest false accusation or evidence tampering. *See* Letter from Dietrich L. Snell, to the Honorable Shirley Wohl Kram, dated 3/22/93, at 2; *see also* Fein Aff. at ¶ 9; Letter from Dietrich L. Snell, to the Honorable Shirley Wohl Kram, dated 3/17/93, at 1–2. The Government further argues that the defendants on trial lack standing to challenge the original wiretap order, which resulted in further investigations, as none of these defendants were either named as a subject in the wiretap order or intercepted during the course of the order's execution. *Id.*

■ The standard for probable cause in a wiretap case is the same as that for a search warrant.[3] *United States v. Biaggi,* 853 F.2d 89, 95 (2d Cir.1988), *cert. denied,* 489 U.S. 1052, 109 S.Ct. 1312, 103 L.Ed.2d 581 (1989); *United States v. Fury,* 554 F.2d 522, 530 (2d Cir.1977), *cert. denied,* 436 U.S. 931, 98 S.Ct. 2831, 56 L.Ed.2d 776 (1978). Under that standard, probable cause exists when

> the facts and circumstances within the affiant's knowledge, and of which he has reasonably trustworthy information, are sufficient unto themselves to warrant a man of reasonable caution to believe that an offense is being committed, has been committed, or is about to be committed.

*United States v. Feola,* 651 F.Supp. 1068, 1089 (S.D.N.Y.1987) (quoting *United States v. Harvey,* 560 F.Supp. 1040, 1951 (S.D.Fla. 1982), *aff'd sub nom., United States v. Van Horn,* 789 F.2d 1492 (11th Cir.1986)), *aff'd,* 875 F.2d 857 (2d Cir.), *cert. denied sub nom., Marin v. United States,* 493 U.S. 834, 110 S.Ct. 110, 107 L.Ed.2d 72 (1989). Probable cause is a "practical, non-technical conception." *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The affidavit must be read as a whole and in light of common sense, with each fact "gaining color" from the others. *United States v. Monica,*

---

**2.** Thereafter, additional wiretap orders were entered on February 12, March 1, March 15, March 29, April 9, April 29, May 9, May 31, and July 23, 1991, authorizing the interception and recording of communications over various cellular telephones belonging to defendants Miguel Kercardo, Eric Millan, Ralph Rivera, Heriberto Rosario, Carlos Rivera, Myles Coker, Julio Salas, and others.

**3.** For purposes of this motion, the Court assumes that the defendants have standing to challenge the wiretap order.

295 F.2d 400, 401 (2d Cir.1961), *cert. denied,* 368 U.S. 953, 82 S.Ct. 395, 7 L.Ed.2d 386 (1962); *see also United States v. Harris,* 403 U.S. 573, 577–79, 91 S.Ct. 2075, 2078–80, 29 L.Ed.2d 723 (1971); *Illinois v. Gates,* 462 U.S. at 230–32, 103 S.Ct. at 2328–29.

 Wiretap orders, like search warrants, are also entitled to a presumption of validity. *Franks v. Delaware,* 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978); *United States v. Fury,* 554 F.2d at 530. In considering whether the issuing court acted properly and based its decision on probable cause, substantial deference must be given to the prior judicial determination, and any doubts should be resolved in favor of upholding the authorization. *Illinois v. Gates,* 462 U.S. at 235–36, 103 S.Ct. at 2330–31; *Aguilar v. Texas,* 378 U.S. 108, 111, 84 S.Ct. 1509, 1512, 12 L.Ed.2d 723 (1964). Even if probable cause is found lacking, the wiretap order should be suppressed only where: (1) the issuing judge abandoned his or her detached, neutral role; (2) the agent was dishonest or reckless in preparing the affidavit supporting the issuance of the wiretap order; or (3) the agent's reliance on the warrant was not objectively reasonable. *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984): *Franks v. Delaware,* 438 U.S. at 171, 98 S.Ct. at 2684.

Having reviewed the affidavits of Special Agent Dongilli and Assistant United States Attorney Snell, the Court finds no evidence that the misconduct of Robles, Beck, or Termini tarnished the investigation resulting in the issuance of the wiretaps.[4] *See* Snell Aff. at ¶¶ 5–22; *see also* Letter from Dietrich L. Snell to the Honorable Shirley Wohl Kram, dated 3/22/93, at 2; Sealed Affirmation of United States Attorney Roger S. Hayes, dated March 23, 1993, at ¶ 6. Virtually every investigative action taken by Robles is extensively corroborated by observations and actions of other members of the NYDETF. Specifically, in each undercover situation, (1) every action taken by Robles, except the actual exchange of drugs for money, was observed by some eight members of Group

92, the surveillance team assigned to watch each undercover transaction; (2) Robles was provided just enough money to purchase an agreed upon amount of heroin; (3) after the buy was complete, the heroin was immediately transported to NYDETF for processing; (4) Agent Dongilli witnessed the weighing of the heroin and its placement into a heat sealed envelope; and (5) the heroin was kept overnight in the DEA vault and then transported to the DEA Northeastern Regional Lab for processing. *See* Snell Aff. ¶¶ 5–18; Dongilli Aff. ¶¶ 27–38. In several instances, the integrity of the undercover purchases was further corroborated by taped communications between Robles and Colon. *See* Snell Aff. at ¶¶ 10, 11, 14, 16. The tape cassettes of these recorded conversations were transported to the NYDETF Office, where Robles signed, dated and sealed the tapes in a DEA heat sealed envelope, in the presence of Agent Dongilli. The sealed envelopes were thereafter submitted to the DEA Non-drug Evidence Custodian. Certain tabs on the tapes were depressed to ensure that no further recording could be made on the tapes. *Id.* Thus, in light of the substantial corroboration of virtually all of Robles's involvement in the *Millan* investigation, the Court finds no evidence of impropriety which would require suppression of the original wiretap order.

Moreover, in addition to the evidence above, which establishes the integrity of the five undercover buys, the Dongilli Aff. contains a wealth of other information which strengthens the issuing judge's finding of probable cause. For example, the Dongilli Aff. includes testimony regarding an October 1, 1990 interview between Agent Dongilli and a confidential informant, who indicated that Eric Millan's brand of heroin, "Blue Thunder", was sold by Jose Colon in the vicinity of East 157th Street between Gerard and Walton Avenues in the Bronx. Dongilli Aff. at ¶¶ 24, 25; Snell Aff. at ¶ 4. The Dongilli Aff. further indicates that NYDETF members recovered trash from in front of two suspected drug locations in the Bronx, which was typical of material used by heroin traffickers,

---

4. In fact, Termini and Beck played only a minor role in the *Millan* investigation and did not provide the basis for any of the warrants or wiretap orders obtained by the NYDETF. Snell Aff. at ¶¶ 22, 23.

Dongilli Aff. at ¶ 39, and that pen registers and telephone toll records revealed probable usage of telephones in drug-related calls. Dongilli Aff. ¶¶ 40–48; *see also United States v. Todisco*, 667 F.2d 255, 258 (2d Cir.1981), *cert. denied sub nom., Vallone v. United States*, 455 U.S. 906, 102 S.Ct. 1250, 71 L.Ed.2d 444 (1982) (pen register and other contacts "subject to an innocent interpretation when viewed in isolation" support probable cause finding when set in context). Thus, in view of the foregoing, the Dongilli Aff. evidenced probable cause justifying the issuance of the January 28, 1991 wiretap order. Accordingly, the defendants' motion to suppress the original wiretap order and any allegedly tainted fruits is denied.[5]

### B. Minimization

■ The defendants also attack the wiretaps on the grounds of inadequate minimization of the monitored conversations. Specifically, counsel for defendants Alfred Bottone, Alfred Bottone, Jr., and Vincent Basciano contend that while Robles was acting as a monitoring agent, the Government failed to minimize the recording of conversations that had nothing to do with narcotics activities. Counsel suggests that Robles deliberately failed to minimize the recording of these conversations because he was interested in obtaining information regarding locations that housed large sums of cash and drugs appropriate for burglarizing. *See* Letter of Maurice H. Sercarz, to the Honorable Shirley Wohl Kram, dated 3/22/93, at 9–10.

As an initial matter, the Court notes that the original January 28, 1991 wiretap order and supporting Dongilli Aff. specifically call for minimization, in accordance with 18 U.S.C. § 2510, *et seq.* Dongilli Aff. ¶ 52. Counsels' speculative assumption that the order's minimization requirement was not complied with is not persuasive. Guided by the factors suggested by the Supreme Court in *Scott v. United States*, 436 U.S. 128, 139–41, 98 S.Ct. 1717, 1724–25, 56 L.Ed.2d 168

(1978), the Court has reviewed the wiretap logs and concludes that these documents provide abundant evidence of compliance with federal minimization standards.

■ As noted in *Scott*, minimization in the context of wiretaps requires a reasonable effort to minimize the interception of irrelevant calls. *Id.* at 140–42, 98 S.Ct. at 1724–26; *United States v. Feola*, 651 F.Supp. at 1098. Minimization will, however, depend on the circumstances of each case. *Id.* Thus, the mere fact that every conversation is monitored does not necessarily violate the minimization requirement. *United States v. Hinton*, 543 F.2d 1002, 1012 (2d Cir.), *cert. denied sub nom., Carter v. United States*, 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976). Rather, the court must consider such factors as the size and extent of the conspiracy under surveillance, the stage of the investigation, the length of the conversations being monitored, and the use to which the telephone is typically put. *Scott v. United States*, 436 U.S. at 140–42, 98 S.Ct. at 1724–26. Thus, "when the investigation is focusing on what is thought to be a wide-spread conspiracy more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise." *Id.* at 140, 98 S.Ct. at 1724–25.

In the case at hand, the Court finds that Robles made a good faith effort to achieve minimization. The logs reveal a high percentage of pertinent calls as compared to the percentage of non-pertinent and non-minimizable calls, i.e., wrongs numbers, busy signals, no answers and conversations too short to determine their pertinence. In fact, the vast majority of non-minimized calls were less than two minutes in length. *See United States v. Capra*, 501 F.2d 267, 275–76 (2d Cir.1974), *cert. denied*, 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975) ("too brief a period for an eavesdropper even with experience to identify the caller and characterize

5. Even if the allegations against Robles are assumed to be true, defendants are not entitled to a hearing under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 as defendants have not, and cannot, show that Special Agent Dongilli was dishonest or reckless in preparing the January 28, 1991 Affidavit. *See Franks v.*

*Delaware*, 438 U.S. at 171–72, 98 S.Ct. at 2684–85 ("[t]o mandate an evidentiary hearing ... there must be allegations of deliberate falsehood or reckless disregard for the truth, and these allegations must be accompanied by an offer of proof.").

the conversation."). Other conversations appear to involve coded language, making characterization impossible until the calls were terminated. In addition, the logs confirm that Robles, and the agents working with him, turned off the surveillance after making a determination of non-pertinence.[6] Thus, the Court concludes that Robles was aware of the minimization requirement and made a good faith effort to comply with its standards. Accordingly, evidence gathered by the wiretap will not be excluded on this basis.

## II. Admission of the Wiretap Tapes

■ The Government requests an *in limine* ruling that would permit all wiretap tapes to be introduced into evidence without the testimony of Robles, who intercepted and recorded the original telephone conversations, or any other wiretap monitor. Instead, the Government seeks to authenticate the wiretap recordings through two summary witnesses, namely, (1) Special Agent Dongilli, the case agent who supervised the wiretap; and (2) James Williams, the legal assistant assigned to this case, who supervised the preparation of 326 single-conversation tapes.

According to the Government, Special Agent Dongilli will testify to the nature and quality of the equipment used to facilitate the wiretaps; testing of the equipment from time to time to ensure that it was in good working order; immediate report and correction of any malfunction in the equipment; the instructions given to the actual monitors; the custody procedures used to maintain the integrity of the tape recordings; his comparison of each conversation reproduced in a single-conversation tape with the original recording; the accuracy of the single-conversation tapes; and the identification of the taped voices. James Williams will testify as to the procedure used to produce the single conversation tapes.

The defendants, objecting to the Government's request, claim that a proper foundation cannot be established to introduce the wiretap tapes in light of Robles's arrest for narcotics trafficking. Relying on the undisputed fact that Robles actually monitored certain key telephone conversations which the Government intends to introduce at trial, and participated, in part, in deciphering other "coded" conversations to determine whether they were drug related, *see* Letter from Benjamin Brafman to the Honorable Shirley Wohl Kram, dated 3/17/93, at 3–4, defendants argue that Robles's arrest precludes a finding of "official regularity" in the making of the wiretap tapes and weighs heavily toward suppression of this evidence. The Court disagrees.

■ Although the Second Circuit has not adopted a specific test for authenticating and admitting wiretap recordings, this district approved a seven factor analysis to determine whether sufficient foundation has been established to properly introduce sound recordings into evidence. *United States v. McKeever,* 169 F.Supp. 426, 430 (S.D.N.Y.1958). Specifically, the Government must show that: (1) the recording device was capable of taping the conversation being offered; (2) the operator of the device was competent to operate the same; (3) the recording is authentic and correct; (4) changes, additions or deletions have not been made in the recording; (5) the recording has been preserved in a proper manner; (6) the speakers can be identified; and (7) the conversation elicited was made voluntarily and in good faith, without any inducement. *Id.* The Second Circuit has also stated, however, that while the *McKeever* approach is a "valuable formulation of the factors a trial judge should consider in making an initial determination whether a sufficient foundation for the admissibility of the tape has been established ... the varying circumstances of particular cases ... militate against the adoption of inflexible criteria applicable to all cases." *United States v. Fuentes,* 563 F.2d 527, 532 (2d Cir.), *cert. denied sub nom., Sansone v. United States,*

---

**6.** A review of the wiretap logs and the Government's discovery material indicates that Robles enlisted Agent Miguel Monge to monitor the wiretaps in an effort to discover information regarding stash houses and drug locations. The Court finds, however, that as with Robles, the minimization requirement was adhered to. The involvement of any other agent in the wiretap phase of the investigation will be disclosed by the Government pursuant to this Court's Order. *See* Section V, *infra.*

434 U.S. 959, 98 S.Ct. 491, 54 L.Ed.2d 320 (1977). Thus, a general standard has been adopted, namely, that the Government must produce " 'clear and convincing evidence of authenticity and accuracy' " as a foundation for such recordings. *Id.* (quoting *United States v. Knohl,* 379 F.2d 427, 440 (2d Cir.), *cert. denied,* 389 U.S. 973, 88 S.Ct. 472, 19 L.Ed.2d 465 (1967)); *see also United States v. Ruggiero,* 928 F.2d 1289, 1303 (2d Cir.), *cert. denied sub nom., Gotti v. United States,* — U.S. —, 112 S.Ct. 372, 116 L.Ed.2d 324 (1991).

The First Circuit has provided more guidance on the issue of the foundation required for admitting wiretap tapes. In *United States v. Cortellesso,* 663 F.2d 361 (1st Cir. 1981), the First Circuit affirmed the district court's ruling admitting into evidence recordings of intercepted telephone conversations without the testimony of the agents who actually monitored the wiretaps. Instead, the supervising agent testified to the procedure followed by the F.B.I. with respect to the intercepts, his presence at the initial test of the equipment, his personal preparation of the transcripts from the tapes, and his custody of the original logs and tape recordings. *Id.* at 364. According to the court, with that testimony, the government had done more than enough to raise the "presumption of official regularity," and "it was not necessary that the agents who did the actual monitoring for the calls take the stand to confirm that they followed [the case agent's] instructions, and to deny tampering with the tapes." *Id.* at 364. The court further stated that once the government presents sufficient foundation testimony, the party challenging the tapes bears the burden of coming forward with evidence that the recordings are inaccurate; the mere fact that "one can conjure up hypothetical possibilities that tampering occurred" would not be sufficient. *Id.*

Similarly, in *United States v. Rengifo,* 789 F.2d 975, 978 (1st Cir.1986), the First Circuit reaffirmed that it does not require authentication of tape recorded conversations by

someone who either participated in or personally overheard the subject matter of the recording in evidence. In *Rengifo,* the testifying witness stated that he supervised the activities of the agents actually manning the listening post and visited the listening post periodically to observe the agents. *Id.* at 978–79. He also described in detail the custody procedures followed to maintain the integrity of the recordings. *Id.* According to the court, this testimony was sufficient to raise a presumption of official regularity, discharging the government's burden of authentication. *Id.* at 979.

Although this Court recognizes that "recorded evidence is likely to have a strong impression upon a jury and is susceptible to alteration," *see United States v. Ruggiero,* 928 F.2d at 1303, the Court also recognizes that once the Government has laid the foundation described in *Cortellesso* and *Rengifo,* a *prima facie* case of authenticity will have been established sufficient to introduce the wiretap tapes into evidence without the testimony of a contemporaneous witness to the recorded conversations.[7] *See United States v. Leon Lopez,* 90 Cr. 73 (SWK); *United States v. Ortiz,* S10 91 Cr. 634 (LJF); *United States v. Salerno,* 740 F.Supp. 171, *rev'd on other grounds,* 937 F.2d 797 (2d Cir.1991) (permitting the introduction of wiretap conversations based on the authentication testimony of the case agent). The burden will then shift to the defendants to show that the tapes are inaccurate. *See United States v. Rengifo,* 789 F.2d at 978. Accordingly, subject to the Government's ability to prove authenticity and accuracy, the Government's request for an *in limine* ruling permitting the wiretap tapes to be introduced without the testimony of Robles is granted.

### III. Cross–Examination of Government Witnesses

■ The Government also seeks a ruling *in limine* precluding defense counsel from

---

7. The same holding applies to the pen register tapes corresponding to the tape recordings. According to the Government, both the audio tapes and pen register tapes are mechanically produced; they were produced simultaneously; and the same custody procedures were followed as to both. *See* Letter from Dietrich L. Snell to the Honorable Shirley Wohl Kram, dated 3/17/93, at 5.

conducting any cross-examination or presenting any evidence regarding the arrests of Robles, Termini and Beck.[8] According to the Government, all testimony or evidence regarding the allegations against Robles and other NYDETF members is inadmissible under Rules 402 and 403 of the Federal Rules of Evidence, as (1) Robles's alleged wrongdoing occurred outside the scope of the *Millan* investigation and is therefore, irrelevant; (2) the propriety of all of Robles's activities in the investigation is corroborated by cooperating defendants and/or NYDETF surveillance; (3) any testimony regarding discussions with Robles is hearsay; and (4) there is no indication that Robles mishandled any evidence in this case. *See* Letter from Dietrich L. Snell to the Honorable Shirley Wohl Kram, dated 3/22/93, at 2–4. The Court disagrees.

First, in its opening statement to the jury, the Government stated as follows:

The evidence will show that on November 2, 1990, ... Noel Melendez helped Marcus Delgado and another man named Vincent Roman sell 600 glassines of "This is it" heroin, the heroin being packaged by Miguel Kercado, to a customer named Bobby, a customer who said he was from out of town.

Now, unbeknownst to the defendants ... you will learn that Bobby, the customer from out of town, was actually Investigator Robert Robles of the New York Drug Enforcement Task Force, and he was acting on an undercover assignment on November 2, 1990. That date turned out to be a very significant one for this organization....

The evidence will show that a couple of weeks after this first contact between Bobby Robles and the Blue Thunder and "This is it" organization, Robles met directly, face-to-face, with Jose Colon, Miguel Kercado's distribution manager. In this conversation that was had between the undercover officer and Jose Colon, the undercover told Colon that he wanted to buy Blue Thunder, and the evidence will show that in response, Jose Colon said that "This is

it", the stuff that he already sold to the undercover was the same stuff.

About a week later, on November 28, 1990, Investigator Robles bought another thousand glassines of heroin directly this time from Jose Colon.... Investigator Robles would buy heroin from Jose Colon on two more occasions; December 20, 1990 and January 31, 1991. By the end of January 1991, the evidence will show that Investigator Robles had established himself as such a good customer that he obtained the telephone number for a mobile telephone that Jose Colon was using in his business....

Now, although the mobile telephones were very important for the defendants to be able to function efficiently, the evidence will show that these phones also led to the defendants' downfall because on January 28, 1991, just shortly after Jose Colon gave out his mobile telephone number to Bobby Robles, the NYDETF got a court order, a federal court order, authorizing the task force to listen in on the conversations that Jose Colon was having ...

The evidence will show that they intercepted conversations relating to the January 31, 1991 undercover buy by Investigator Robles. You will hear Investigator Robles speaking with Jose Colon over his telephone to arrange that transaction.

*See* Trial Transcript ("Tr.") at 39–42. The clear import of the Government's opening statement, made to this Court and the jury after Robles's arrest, was that Robles was a reliable, credible witness who would be providing significant testimony at trial. The opening statement further outlined the pivotal role Robles played in providing the foundation for the wiretap applications and penetrating the Blue Thunder organization. As a result, evidence regarding the arrests of Robles, Termini and Beck "more than satisfies the minimal relevancy standards of Fed. R.Evid. 401 if for no other reason than the fact that [the Government] made the evidence relevant through ... [its] opening statement and trial strategy." *See United States v. Khan,* 787 F.2d 28, 34 (2d Cir.1986).

---

**8.** At this time, the Government does not intend to call either Robles, Termini or Beck as witnesses

at trial. *See* Letter from Dietrich L. Snell to the Honorable Shirley Wohl Kram, dated 3/19/93.

Thus, in light of the Government's opening, which implicates the credibility of Robles, the Court finds that the contested testimony is relevant to rebut the Government's arguments to the jury.

Second, although the Government strenuously argues that there is no credible evidence showing any misconduct by the three arrested agents prior to 1992 [9], long after the conclusion of the *Millan* investigation, the Court finds that certain evidence demonstrates that the misconduct extended over a longer period of time. For instance, at the evidentiary hearing held on March 23, and March 24, 1993, Serrano testified to having met Robles while working at a Latin Club at the Holiday Inn Hotel in Hauppauge, Long Island, approximately five years ago. He testified that the club closed at some point either a year and a half or two years ago.[10] Serrano acknowledged that on at least one occasion while he and Robles were employed at the club, Robles bragged about having taken the proceeds of a "bust" and pocketing the money. Tr. at 998, 1013–15, 1097. Moreover, Serrano testified that while the two were employed at the club, Robles wore expensive jewelry, including a diamond ring, Tr. at 1018,; and offered jewelry to Serrano to fence. Tr. at 1096.

In addition, Serrano's debriefing notes, which have been entered into evidence, reveal that while the two were employed at the club, Robles told Serrano about trips that he and other agents had taken to Puerto Rico and about buying his girlfriend a fur coat. *See* Notes, dated 3/15/93, at 6; Tr. at 1095, 1129.

A second witness, Abecasis, also testified that during several lengthy conversations, Serrano told him that the criminal conduct involving Robles spanned three to five years. Tr. at 935–36. Therefore, despite the Government's disavowal, the evidence outlined above suggests that Robles's criminal activity spanned a longer period than eighteen months—possibly extending back to the time of the *Millan* investigation—and is thus, relevant.

Third, the Court does not find that evidence of the Robles investigation should be excluded pursuant to Rule 403 of the Federal Rules of Evidence on the grounds that its probative value is substantially outweighed by the danger of unfair prejudice. The Court is afforded broad discretion in balancing these factors, and finds that in the case at hand, the jury is entitled to know that Robles, whose various undercover buys were laid out in detail in the Government's opening remarks, is himself accused of heroin trafficking.

Nor can the Court at this time issue a blanket ruling excluding all evidence or cross-examination on the basis of hearsay. Although many conversations between future witnesses and the three accused agents may in fact constitute hearsay, the Court can fathom instances where evidence regarding Robles's alleged misconduct will be admissible. Accordingly, rather than issue a ruling *in limine* precluding all reference to the Robles investigation, as the Government requests, the Court will permit cross-examination regarding the allegations against Robles, with the following provisos: (1) questioning as to the alleged misconduct of Robles, Beck

---

9. *See* Fein Aff. at ¶ 9 ("Robles has stated emphatically that he committed no illegal acts in connection with the *Millan* case, and that his illegal conduct did not begin until within the last twelve months"); Letter from Dietrich L. Snell to the Honorable Shirley Wohl Kram, dated 3/17/93, at 2 ("the record is clear that all of the allegations against Robles, Beck, or Termini relate to events that occurred well after the conclusion of the *Millan* wiretaps"); Letter from Dietrich L. Snell to the Honorable Shirley Wohl Kram, dated March 22, 1993, at 4 ("defense counsel's hopeful speculation that Robles *may* have acted improperly in connection with the *Millan* investigation—simply because he allegedly engaged in misconduct many months after he ceased to be involved in the investigation—provides no basis for permitting testimony or argument about subsequent events unrelated to Robles' involvement in the *Millan* investigation"); Letter from Dietrich L. Snell to the Honorable Shirley Wohl Kram, dated 3/24/93, at 1 ("Simply put, there is *no* credible evidence that any misconduct by the NYDETF officers occurred while the *Millan* investigation was under way").

10. The Government has since offered documents showing that the Holiday Inn closed in September of 1991—one month following the arrests in the *Millan* case.. *See* Affidavit of James Harney, sworn to on March 24, 1993.

and Termini shall be limited to the period of time involving the *Millan* investigation; (2) questioning regarding the arrests of the three agents shall be limited to the witnesses' personal knowledge.

## IV. *Dismissal of the Indictment as to Defendant Noel Melendez*

■ In a letter dated March 22, 1993, Mitchell Golub, counsel for defendant Noel Melendez, requests that the Court dismiss the indictment as to his client in light of the allegations against Robles and the Government's decision not to call Robles as a witness. Specifically, Melendez argues that virtually none of the evidence in this case supports the charges pending against him: he is not intercepted on a single wiretap conversation; his name does not appear on any narcotics records; and no narcotics, narcotics paraphernalia, narcotics records or weapons were found in his possession or at his dwelling. *See* Letter from Mitchell Golub to the Honorable Shirley Wohl Kram, dated 3/22/93, at 2. In fact, Melendez contends that the sole evidence against him arises from the November 2, 1990 undercover buy of heroin by Robles, at which time Robles was introduced to Melendez by a confidential informant. Melendez now argues that absent corroborating testimony by Robles, there is no evidence supporting the charges contained in the indictment. *Id.*

Contrary to defendant's arguments, however, the Government's case against Melendez includes evidence in addition to Robles's testimony. Specifically, the heroin sale in which Melendez participated was witnessed by NYDETF surveillance agents and by a cooperating defendant, Marcos Delgado, who will testify at trial. *See* Snell Aff. at ¶ 7; Letter from Dietrich L. Snell to the Honorable Shirley Wohl Kram, dated 3/24/93, at 2.

Furthermore, despite the suggestion that Robles's criminal activity continued for over eighteen months, there is no evidence that Robles mishandled evidence in this case or that heroin purchased by Robles from Melendez and his cohorts was "really the by-product of Robles' [sic] own corrupt activities." *See* Letter from Mitchell Golub to the Honorable Shirley Wohl Kram, dated 3/17/93, at 6.

To the contrary, the record establishes that Robles was provided with only enough money ($6,000) to buy precisely 600 sealed glassine envelopes of heroin—the amount involved in the Melendez sale. The record further establishes that Robles's contact with the evidence was absolutely routine and generally occurred in the presence of other law enforcement personnel. Snell Aff. at ¶¶ 5–20. Thus, there is no reason to believe that anything Robles handled was tampered with or that the heroin Robles purchased came from his own illegal activities rather than those of Melendez and his co-conspirators.

Finally, the Court believes that counsel for Melendez will have sufficient opportunity (1) to develop through cross-examination of the testifying agents any impropriety by Robles during the course of the *Millan* investigation; and (2) in his summation recount the lack of evidence against his client. Accordingly, Melendez's motion for an order dismissing the indictment is denied.

## V. *Motions for Additional Disclosure*

■ The defendants request that they be given full and complete access to all information that is presently available to the Government regarding the Robles/Beck/Termini investigation. *See* Letter of Benjamin Brafman to the Honorable Shirley Wohl Kram, dated 3/17/93, at 2; *see also Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). This request is granted in part.

■ The law is clear that pursuant to *Brady* and its progeny, the Government must disclose evidence "favorable to the accused and material to the determination of guilt or to the appropriate punishment." *Id.* at 87, 83 S.Ct. at 1196–97; *see also United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Under the *Brady* rule, the Government has a continuing obligation to disclose information that would impeach a government witness, including evidence pertinent to the witness's credibility or reliability. *Perkins v. LeFevre,* 642 F.2d 37, 40 (2d Cir.1981); *see also United States v. Bufalino,* 576 F.2d 446, 450 (2d Cir.1978), *cert. denied,* 439 U.S. 928, 99 S.Ct. 314, 58 L.Ed.2d 321 (1978) ("investigative agencies must define

discoverable evidence very broadly, including any materials that might be favorable to the accused."). Thus, in *United States v. Kiszewski*, 877 F.2d 210, 216 (2d Cir.1989), the Second Circuit held that the trial court, relying solely upon the Government's representations concerning the contents of a testifying F.B.I. agent's personnel file, acted improperly in refusing to compel production of information indicating that the witness was "on the take."

Having now conducted an *in camera* review of the Government's materials regarding the Robles/Beck/Termini investigation, the Court will not, however, order the Government to produce its entire file. As an initial matter, the Government does not intend to call Robles, Beck or Termini as witnesses at trial. Second, the Court finds no prejudice to the defendants in not producing notes regarding individuals and events unrelated to the *Millan* investigation. *See United States v. Warme*, 572 F.2d 57, 62 n. 6 (2d Cir.), *cert. denied*, 435 U.S. 1011, 98 S.Ct. 1885, 56 L.Ed.2d 393 (1978) (no error by trial court in failing to order Government disclosure of F.B.I. agent's reports regarding the ongoing investigation of a person only tangentially involved in defendant's illegal conduct). On the other hand, however, the Court recognizes that the Government has made Robles's credibility an issue by relying heavily, during opening arguments, upon his conduct to prove the Government's case. Accordingly, having examined the Government's files, the Court orders the release of the following information: (1) IAD Investigating Officer's Report, from Sergeant Gerald Lavin, dated 3/8/93 (Bates Stamp Nos. Termini 56–58); (2) Handwritten notes dated 3/8 (Bates Stamp No. Termini 7–11); (3) Handwritten notes dated 3/25/93 (Bates Stamp Nos. Termini 51–55); (4) New York State Police Memorandum, dated 3/20/93 (Bates Stamp Nos. Robles 4–12); (5) Handwritten notes dated 3/16/93 (Bates Stamp Nos. Robles 13–21); and (6) Handwritten notes dated 3/4/93 (Bates Stamp Nos. Termini 12–45). The Government is also ordered to disclose the names of any additional agents, currently under investigation, who participated in the *Millan* investigation. The disclosure of the identity of these individuals is necessary to prevent additional unfair surprise and mitigate the possibility of further delay. It is also ordered, however, that the defendants and defendants' counsel are prohibited from further disclosing the contents of the files to any individual not connected with the above-captioned case.

## VI. *Prejudice to the Defendants*

██ Finally, defense counsel argues that all of the defendants were prejudiced by the Government's failure to make any disclosure regarding Robles prior to opening statements. As a result, the defendants request an opportunity to conduct additional opening arguments. The defendants further request that the Court appoint a Special Prosecutor to investigate criminal conduct by the Task Force agents, and stay further proceedings until the Special Prosecutor has completed the preliminary stages of his or her investigation.

In response, the Government contends that it had no obligation to disclose bad acts of its trial witnesses or even exculpatory evidence prior to trial, and that any additional opening arguments would only confuse and inflame the jury with irrelevant issues. The Government further maintains that "far from being prejudiced by the timing of the disclosure of the Robles allegations, the defendants actually received a tremendous windfall...." *See* Letter from Dietrich L. Snell, to the Honorable Shirley Wohl Kram, dated 3/22/93, at 5. The Court disagrees.

It is now clear to the Court that while the Government was presenting its opening statement to the jury, an opening which implicated the integrity of Robles, a significant secret investigation was being conducted which connected Robles with corruption and narcotics trafficking. Moreover, unbeknownst to the Court or defense counsel, this investigation extended over several months. Although the Government now characterizes its failure to notify the Court of Robles's impending arrest as "human error", *see* Letter from Denise Cotes to the Honorable Shirley Wohl Kram, dated 3/26/93, at 2, the Court finds that the Government has acted inexcusably in disrupting and delaying the *Millan*

trial.[11] It is truly irresponsible for the Government to have opened in this case with arguments regarding Robles's credibility, while withholding pertinent information, placing Robles's credibility in doubt.

Moreover, the mishandling of the Robles incident is not an isolated event. The Court is also disturbed by the Government's failure to alert the Court to a conflict burdening Eric Millan's counsel, Michael Pollack, which has resulted in the severance of the lead defendant from this case. Although the Government received information on January 25, 1993, indicating that Pollack's continued representation of Millan in this district was subject to a conflict of interest, it failed to notify the Court of the situation until March 23, 1993. *See* Memorandum to Files from Ronald G. Gardella, dated March 23, 1992. As the Government itself concedes, "timely disclosure of the conflict of Millan's counsel would have afforded Millan sufficient opportunity to select alternative counsel so that he could proceed to trial with other defendants." Letter from Dietrich L. Snell to the Honorable Shirley Wohl Kram, dated 3/24/93, at 3. Nevertheless, this was not done.

Despite this misconduct, however, the Court finds that extraordinary measures such as permitting additional opening arguments or appointing a Special Prosecutor are not warranted. Such truly extreme relief would be inappropriate and merely serve to inflame and confuse a jury already sorely tested by the unfolding events in this case. Rather, the Court finds that effective cross-examination will adequately cure any misleading information previously relayed to the jury. Therefore, the defendants' request for an opportunity to make additional opening arguments and the appointment of a Special Prosecutor is denied.

### Conclusion

For the reasons set forth above, defendants' motion for an order (1) dismissing the indictment; (2) suppressing the original wiretap; (3) granting additional opening arguments; and (4) appointing a Special Prosecu-

tor is denied. In addition, defendants' request for additional disclosure and cross-examination regarding the Robles/Beck/Termini investigation is granted according to the terms and conditions detailed above. The Government's request for a ruling *in limine* permitting the introduction of wiretap evidence through the testimony of Agent Dongilli and James Williams is granted.

SO ORDERED.

---

**11.** Although the Court does not doubt that the Assistant United States Attorneys prosecuting this case were unaware of the Robles investigation, the Court notes that the Government speaks with one voice and is responsible for letting the right hand know what the left hand is doing. *United States v. Bravo,* 808 F.Supp. 311, 320 n. 10 (S.D.N.Y.1992).