USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT ____________________ No. 92-2031 UNITED STATES OF AMERICA, Appellee, v. GERARDO DELGADO MUNOZ, Defendant, Appellant. _____________________ No. 92-2032 UNITED STATES OF AMERICA, Appellee, v. SAUL ANDINO FIGUEROA, a/k/a BRUNO, Defendant, Appellant. ____________________ No. 92-2033 UNITED STATES OF AMERICA, Appellee, v. JUAN MARTINEZ, Defendant, Appellant. ____________________ No. 92-2034 UNITED STATES OF AMERICA, Appellee, v. LEANDRO QUINONES, Defendant, Appellant. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. A. David Mazzone, U.S. District Judge] ___________________ ____________________ Before Boudin, Circuit Judge, _____________ Coffin, Senior Circuit Judge, ____________________ and Pettine,* Senior District Judge. _____________________ ____________________ Owen S. Walker for appellant Gerardo Delgado Munoz. ______________ John C. Doherty, by Appointment of the Court, for appellant Saul _______________ Andino Figueroa. Raymond E. Gillespie, by Appointment of the Court, for appellant ____________________ Leandro Quinones. Nicholas B. Soutter, by Appointment of the Court, with whom Paul ___________________ ____ S. McGovern was on brief for appellant Juan Martinez. ___________ Dina Michael Chaitowitz, Assistant United States Attorney, _________________________ Organized Crime Drug Enforcement Task Force, with whom Donald K. __________ Stern, United States Attorney, was on brief for the United States. _____ ____________________ October 13, 1994 ____________________ ____________________ *Of the District of Rhode Island, sitting by designation. *Of the District of Rhode Island, sitting by designation. BOUDIN, Circuit Judge. Appellants Gerardo Delgado- _____________ Munoz, Leandro Quinones, Juan Martinez, and Saul Andino- Figueroa were indicted on June 21, 1991, for conspiracy to distribute cocaine base, commonly known as "crack" cocaine, in violation of 21 U.S.C. 841(a)(1) and 846. Delgado was alleged to have been the ringleader of the operation, with Quinones serving as his chief lieutenant and Andino and Martinez filling various subordinate roles as lookout, courier, driver and guard. The indictment alleged that members of the conspiracy had sold cocaine base to an undercover operative of the Drug Enforcement Administration, Pamela Mersky, on six different occasions in April and May 1991. The transactions, which all took place in Boston and its suburbs, involved a total of 896.2 grams of cocaine base, 506 grams of which changed hands in the final transaction on May 30, 1991. In addition to conspiracy, each defendant was charged with one or more substantive counts of cocaine distribution corresponding to the transactions in which he participated.1 Appellants and two other co-defendants were tried to a jury in April 1992. The government's evidence consisted ____________________ 1Specifically, Delgado and Quinones were charged with six substantive distribution counts arising out of transactions on April 9, 19, 23, May 6, 16, and May 30, 1991. Andino was charged with four substantive distribution counts pertaining to the April 23, May 6, 16, and May 30 transactions. Martinez was charged with one distribution count for the May 30 transaction. -3- -3- primarily of Special Agent Mersky's testimony, supported by tape-recordings of her conversations with the defendants and testimony of surveillance agents who monitored the transactions. The jury convicted appellants on all counts. One co-defendant, Paulita Cadiz, was also convicted on all counts but has not appealed; the remaining defendant, Lazaro Delgado, was acquitted. On June 29, 1992, the court sentenced Andino to 151 months' imprisonment, Martinez to 240 months' imprisonment, and sentenced Delgado and Quinones each to 360 months' imprisonment. These appeals followed. Each appellant except Delgado challenges his conviction, and all challenge their sentences. We first consider appellants' challenges to various evidentiary rulings and instructions at trial, as well as to the sufficiency of the evidence on various counts. Thereafter, the sentencing issues are addressed. I. THE CONVICTIONS A. Andino We begin with the conviction of Andino, who is also referred to in the indictment as "Bruno." Andino was alleged to have assisted Delgado and the others on at least four drug transactions by watching over the drugs, conducting counter- surveillance, and sometimes by making the actual delivery. He argues first that the trial court erroneously admitted a spontaneous confession made upon his arrest in Puerto Rico. -4- -4- Andino was not present at the May 30, 1991, transaction between his co-defendants and Mersky, after which the other defendants were arrested. Instead, Andino was apprehended on November 26, 1991, when United States Marshals executed an arrest warrant for Andino in Catalina, Puerto Rico. Upon arriving at Andino's home, the marshals were met at the door by appellant's brother, Cuco Andino-Figueroa, whom the marshals initially mistook for appellant. When the marshals told the brother that they had a warrant from Boston for narcotics offenses, appellant entered the room and shouted, "I'm the one you are looking for. I'm the guilty one. He's never been to Boston. I'm the one that's been to Boston." Prior to trial, Andino filed a motion in limine to __________ preclude testimony as to his spontaneous confession. At a hearing, Andino argued that the confession should be excluded because it would guarantee conviction. Construing this as an argument under Fed. R. Evid. 403, the district court denied the motion on the ground that the confession was "strongly probative of [Andino's] knowledge and his intent," and was "not unfairly prejudicial." Andino now argues that the district court failed to adequately consider the prejudicial impact of the confession in striking the Rule 403 balance. The district court's wide latitude in admitting or excluding evidence under Rule 403 is well established. Daigle v. Maine Medical Center, Inc., 14 F.3d 684, 690 (1st ______ ___________________________ -5- -5- Cir. 1994). The district court found--and we agree--that Andino's outburst "shows knowledge on the part of the defendant . . . that a particular crime involving narcotics was the subject of the arrest, and it took place in Boston." The admission has special importance since at trial Andino argued that the government had arrested the wrong man. The damage done to the defense is not a basis for exclusion; the question under Rule 403 is "one of `unfair' prejudice--not of prejudice alone." United States v. Moreno Morales, 815 F.2d _____________ ______________ 725, 740 (1st Cir. 1987). We turn next to a hearsay issue. At trial, Mersky was allowed, over Andino's objection, to testify that a landlord had given federal drug agents a rent receipt showing that Andino rented a room at 6 Michigan Avenue in Dorchester, Massachusetts. That address was shown at trial to have been a center of the conspiracy. Andino argued both at trial and on appeal that he was prejudiced by any reference to the rent receipt--which, he contends, was "blatant hearsay" and should not have been admitted. Although the government might have argued that the rent receipt itself was not hearsay, cf. Fed. R. Evid. 801(a) (a ___ "statement" is an oral or written "assertion"), it is apparently willing to treat the testimony in question as if it were a report of what the landlord said orally to the DEA agents. But the government insists that the testimony was -6- -6- not elicited or used for purposes of proving that Andino actually lived at 6 Michigan Avenue. Rather, it says that the testimony was brought out on redirect merely in order to explain that Mersky had some colorable reason--whether or not correct--for attaching Andino's name to the description she furnished to the marshals in Puerto Rico. This redirect was important, the government says, because during the drug deals, about which Mersky testified at length, she had known Andino only as "Bruno" and had no knowledge of his real name. On cross-examination of Mersky, Andino's defense counsel had brought out this fact; he suggested in further questions that Mersky's description of Bruno, given to the marshals in Puerto Rico, did not match Andino's appearance in the courtroom; and arguably he left the impression through his questions that there was something suspicious in the unexplained appearance of Andino's real name in the information given to the marshals. It is quite true that an out-of-court statement is not hearsay if it is used only to show that the statement was made and that the listener heard the words uttered. See 6 ___ Fed. R. Evid. 801(c) (hearsay is an out-of-court statement offered "to prove the truth of the matter asserted"). We have no doubt that it was on this theory that the district judge overruled the hearsay objection, saying that Mersky "doesn't know whether it is true or not [that Andino lived at -7- -7- 6 Michigan Avenue]. She just knows how she found out. It is not offered for the truth of the matter, just how she found out." Whether or not there is still an underlying hearsay problem is an issue that could be debated at length; and in some measure it might depend on matters not clearly developed: exactly what the landlord said; just what information was relayed to Mersky and then to the marshals; and precisely what inference the government is aiming to refute. We see no reason to engage in these speculations because the admission of this evidence was patently harmless. Mersky had dealt face to face with "Bruno" on four different occasions. Her ability to identify Andino as Bruno could be easily tested in the courtroom and was in fact tested on cross-examination. The jury was also apprised of Andino's virtual confession at the time of his arrest ("I'm the guilty one."), and his further incriminating statement after his arrest (Andino told his father that there was no point in a removal hearing since "[Mersky] would come over and identify me"). The alleged hearsay did not alter the outcome. Andino next claims that there was insufficient evidence to support his conviction for the May 30, 1991, transaction in which other defendants sought to sell 506 grams of cocaine base to Mersky. The parties agree that Andino was not present at this transaction. At trial, the government argued -8- -8- that Andino was liable under Pinkerton v. United States, 328 _________ _____________ U.S. 640 (1946). Pinkerton permits a defendant to be held _________ liable for actions committed by a co-conspirator if that crime is in furtherance of the conspiracy and is committed while the defendant is a member of the conspiracy. Id. at ___ 328. See United States v. O'Campo, 973 F.2d 1015, 1021 (1st ___ _____________ _______ Cir. 1992). In this court, Andino does not dispute the theory but argues that the evidence at trial was so thin that his motion for judgment of acquittal should have been granted. This requires Andino to "bear the heavy burden of demonstrating that no reasonable jury could have found [him] guilty beyond a reasonable doubt." United States v. Innamorati, 996 F.2d _____________ __________ 456, 469 (1st Cir.), cert. denied, 114 S. Ct. 409 (1993). We ____________ review the evidence in the light most favorable to the government, "drawing all plausible inferences in its favor and resolving all credibility determinations in line with the jury's verdict." Id. ___ Under Pinkerton, the government was required to prove _________ that the May 30 transaction was carried out by members of the conspiracy, in furtherance of the conspiracy, and at a time when Andino was still a member of the conspiracy. Andino has not claimed a lack of evidence to support his conspiracy conviction. Nor does he dispute that the May 30 transaction was in furtherance of the conspiracy. But he does dispute -9- -9- that he was still a member as of May 30, 1991, arguing in his brief that he "disappeared entirely from the Government's radar screen" after May 16, 1991. In fact, there is no evidence in the record concerning his activities after that date until his arrest in Puerto Rico on November 26, 1991. A "`mere cessation of activity in furtherance of a conspiracy does not constitute withdrawal.'" United States _____________ v. Nason, 9 F.3d 155, 162 (1st Cir. 1993), cert. denied, 114 _____ ____________ S. Ct. 1331 (1994) (quoting United States v. Juodakis, 834 _____________ ________ F.2d 1099, 1102 (1st Cir. 1987)). To withdraw, a conspirator must take some affirmative action "either to defeat or disavow the purposes of the conspiracy." Juodakis, 834 F.2d ________ at 1102. Typically, we have required "evidence either of a full confession to authorities or a communication by the accused to his co-conspirators that he has abandoned the enterprise and its goals." Id. Even if a very extended ___ lapse of time might be sufficient to infer withdrawal, the two-week interval in this case is not enough. B. Martinez Appellant Martinez also challenges his conviction. Both Martinez and his co-defendant, Gerardo Delgado, pleaded guilty on October 30, 1985, in Connecticut state court to possession of cocaine with intent to distribute it. The government introduced these convictions at trial over the defendants' objections in order to show, inter alia, ___________ -10- -10- "knowledge and intent in a common scheme or plan." Martinez now asserts that "[a]dmission of evidence of Martinez' prior conviction impermissibly prejudiced his defense," but adds no explanation to this one-line allegation. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." United States _____________ v. Zannino, 895 F.2d 1, 17 (1st Cir.), cert. denied, 494 U.S. _______ ____________ 1082 (1990). Martinez also says that the evidence was insufficient to support his convictions for conspiracy, and for possession with intent to distribute on May 30, 1991. The government's evidence on both counts arises from the May 30 transaction. Martinez was first spotted at about 6:50 p.m. that evening by a state police officer who saw Martinez walking up and down the street outside SkipJack's restaurant in Brookline Village. Mersky, who had been told by Delgado to wait outside SkipJack's at 7:30 p.m. in order to purchase drugs, testified that Martinez greeted her there and then walked away. Shortly thereafter, Delgado contacted Mersky by signaling her beeper. When Mersky called Delgado from a pay phone, Mersky was told to meet Paulita Cadiz, who (along with Lazaro Delgado) accompanied her to a blue-colored Oldsmobile occupied by Martinez and a female juvenile. Martinez, then sitting in the driver's seat, pushed a large piece of luggage -11- -11- located on the passenger-side floor toward Lazaro Delgado and assisted him in opening it. The bag contained numerous vials of cocaine base. Mersky took the bag and walked away, announcing that she was "going to get the money." As Mersky walked away, she signalled to two officers who were waiting in an unmarked car nearby. The officers, each of whom were wearing raid jackets marked with police insignia, got out of their car and turned toward the blue Oldsmobile, displaying firearms and shouting "police." Both officers testified that Martinez then threw the Oldsmobile into reverse and backed up Brookline Avenue at a high rate of speed. After crashing into another unmarked police cruiser, Martinez put the car back in forward gear and sought to flee. He was eventually stopped and arrested. The testimony was ample to convict Martinez on both the conspiracy and substantive distribution counts. A reasonable jury could have inferred that Martinez was conducting counter-surveillance when he was first observed outside SkipJack's. Martinez was the only adult in the blue Oldsmobile along with the suitcase containing the drugs; since he then pushed the drugs over to Lazaro Delgado to give to Mersky, the jury could reasonably have found that Martinez had possessed the drugs.2 His intent to distribute can ____________________ 2Martinez argues that he could not have possessed the drugs because he did not have sole access to the bag. Exclusive access is not a prerequisite to possession; indeed, -12- -12- likewise be inferred from this same event and from his participation in the overall transaction. The attempt to flee further corroborates his guilt. The jury was also entitled to infer that Martinez agreed to cooperate with his alleged co-conspirators in carrying out the transaction. The many steps of the dance performed by the participants indicate careful planning and coordination, and Martinez's own multiple roles--lookout, initial contact with Mersky, guardian of the drugs--do not look like the unplanned actions of an unwitting victim who was merely along for the ride. In any event, the evidence was sufficient for a reasonable jury to convict Martinez on both the conspiracy and substantive distribution counts. C. Quinones The remaining appellant is Quinones. The government alleged at trial that Quinones was Delgado's partner in their drug distribution activities. Quinones now argues that the district court erred in instructing the jury on the issue of liability for crimes committed by co-conspirators under the Pinkerton doctrine. As already explained, Pinkerton allows a _________ _________ defendant to be held criminally liable for the acts of a co- conspirator carried out in furtherance of the conspiracy at a time when the defendant is a member of the conspiracy, even ____________________ "joint possession" is one of the possibilities mentioned in the standard charge. See, e.g., United States v. Maldonado, ___ ____ _____________ _________ 23 F.3d 4, 6-7 (1st Cir. 1994). -13- -13- though the defendant himself did not participate in those acts. See 328 U.S. at 645-48. ___ Quinones argues that the district court should have emphasized the jury's obligation to find each element of Pinkerton beyond a reasonable doubt. Although the district _________ court gave a separate reasonable doubt instruction applicable to the entire case, Quinones cites us to the Seventh Circuit's decision in United States v. McKenzie, 922 F.2d _____________ ________ 1323, 1330 (7th Cir.), cert. denied, 112 S. Ct. 163 (1991), ____________ which suggested that a complete Pinkerton instruction should _________ inter alia "`advise jurors that the government [bears] the __________ burden of proving . . . all elements of the powerful Pinkerton doctrine . . . beyond a reasonable doubt'" (quoting _________ United States v. Elizondo, 920 F.2d 1308, 1317 (7th Cir. ______________ ________ 1990)). This court "evaluate[s] [a] challenged instruction in the context of the overall charge." E.g., United States v. ____ ______________ Vavlitis, 9 F.3d 206, 212 (1st Cir. 1993). Similarly, the ________ Supreme Court in Cupp v. Naughten, 414 U.S. 141, 146-47 ____ ________ (1973), referred to "the well-established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." Here, the district court began its charge by stating that the government was obligated to "prove every element of every offense beyond a reasonable doubt," and -14- -14- referred to that burden of proof over a dozen times during the course of its instructions. Pinkerton may be a powerful doctrine, but there is no _________ reason to think that the jury is especially likely to forget the general instruction on reasonable doubt when it comes to applying Pinkerton. We have no intention of constructing a _________ special requirement that reasonable doubt be mentioned again, after an adequate general statement, in relation to selected elements in an offense or theory of liability. Indeed, in United States v. Mount, 896 F.2d 612, 623-24 (1st Cir. 1990), _____________ _____ cert. denied, 114 S. Ct. 415 (1993), we rejected just such an ____________ argument pertaining to the district court's instruction on interstate transportation of stolen property. II. THE SENTENCES Appellants also challenge numerous aspects of their sentences under the federal sentencing guidelines, and we consider each appellant's claims in turn--starting with Delgado, the alleged ringleader of the drug distribution conspiracy. A. Delgado At Delgado's sentencing, the district court began with a base offense level of 36 in light of the amount of drugs involved, added one level because drug distribution activity took place in proximity to a school, U.S.S.G. 2D1.2, then added four levels for Delgado's leadership role. U.S.S.G. -15- -15- 3B1.1(a). The court denied Delgado a two-level reduction for acceptance of responsibility, see U.S.S.G. 3E1.1, and ___ placed him in criminal history category II based on a 1985 Connecticut conviction for possession of cocaine with intent to distribute. The court then sentenced Delgado to 360 months, the bottom of the resulting guideline range. On appeal, Delgado first contests the district court's denial of a reduction for acceptance of responsibility. Shortly after his arrest, Delgado made a statement to police officers in which, he asserts, he accepted responsibility for his crime. In that statement, according to police reports, Delgado acknowledged that he had called someone who had the cocaine in order to set up the transaction, and had then called Special Agent Mersky to arrange a meeting. Despite this admission, Delgado subsequently pled not guilty to the indictment and went to trial. Delgado now contends that the district court failed to consider his post-arrest statement and refused to reduce his offense level under section 3E1.1 solely as punishment for invoking his constitutional right to a trial. The district court addressed the statement made by Delgado, but concluded in substance that it was not a full acceptance of responsibility. Indeed, while the statement admitted that Delgado played some role in the offense, it downplayed his own role and asserted that some unnamed individual was the -16- -16- true source of the drugs. The court's decision is reviewed only for clear error, and no such error occurred here. United States v. Donovan, 996 F.2d 1343, 1346 (1st Cir. ______________ _______ 1993); U.S.S.G. 3E1.1, application note 5. At sentencing, the district court said that Delgado's failure to plead guilty was an important factor in the denial of credit. This is consistent with the guidelines, which provide that "[c]onviction by trial . . . does not automatically preclude a defendant from consideration for such a reduction" but ordinarily the adjustment "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G. 3E1.1, application note 2.3 Obviously, the guideline, consistent with pre-guideline practice, means that a defendant who declines to plead guilty reduces the chance of a lightened sentence. But "not every burden on the exercise of a constitutional right, and not ____________________ 3There are exceptions; the guidelines specifically mention one who "litigates to preserve issues that do not relate to factual guilt . . . ." Id. Delgado argues on ___ appeal that he failed to plead guilty to avoid being immunized and forced to testify against his brother, Lazaro Delgado, on behalf of the government. Since neither this argument nor any evidence in support of it were ever presented to the district court, we do not consider the claim. United States v. Dietz, 950 F.2d 50, 55 (1st Cir. _____________ _____ 1991). -17- -17- every pressure or encouragement to waive such a right, is invalid." Corbitt v. New Jersey, 439 U.S. 212, 218 (1978) _______ ___________ (possibility of a lesser sentence through a plea bargain does not unconstitutionally burden the right to stand trial). The guidelines "merely codify a tradition of leniency [for guilty pleas] and are not an impermissible burden on the exercise of constitutional rights." United States v. Uribe, 891 F.2d _____________ _____ 396, 400 (1st Cir. 1989), cert. denied, 495 U.S. 951 (1990). ____________ Delgado also objects to the district court's consideration, in calculating his criminal history category, of a prior Connecticut conviction for unlawfully possessing cocaine with intent to distribute. At his sentencing hearing in the present case, Delgado sought to attack collaterally the prior state conviction, asserting that his guilty plea in that case was constitutionally invalid. The district court, relying upon our decision in United States v. Paleo, 967 F.2d _____________ _____ 7 (1st Cir. 1992), considered Delgado's arguments on the merits but determined that the guilty plea "passed constitutional muster." After Delgado's sentencing, Paleo was greatly narrowed _____ by United States v. Isaacs, 14 F.3d 106, 108-110 (1st Cir. _____________ ______ 1994), which held that the sentencing guidelines provide no independent authority for collateral review of prior convictions used in calculating a defendant's criminal history category. Although Isaacs preserved certain ______ -18- -18- exceptions based upon the Constitution rather than the guidelines, the Supreme Court subsequently held in Custis v. ______ United States, 114 S. Ct. 1732 (1994), that the Constitution _____________ requires collateral review of a prior conviction used to enhance a defendant's federal sentence only where the defendant alleges a complete denial of his Sixth Amendment ________ right to counsel in the prior proceeding. Although Custis considered collateral attack under the ______ Armed Career Criminal Act rather than the sentencing guidelines themselves, the constitutional question is the ______________ same in each context. Like Delgado in the present case, Custis alleged that one of his prior convictions was procured pursuant to a guilty plea that was not knowing and intelligent as required by Boykin v. Alabama, 395 U.S. 238 ______ _______ (1969). The Supreme Court rejected this argument, noting that "when a guilty plea is at issue, `the concern with finality served by the limitation on collateral attack has special force.'" 114 S. Ct. at 1738 (quoting United States _____________ v. Timmreck, 441 U.S. 780, 784 (1979)). Given Custis, we do ________ ______ not reach the merits of Delgado's challenge to his earlier conviction. B. Andino We turn now to the sentencing claims of Andino. The district court began with a base offense level of 36, finding that Andino was responsible for 745.1 grams of cocaine base. -19- -19- U.S.S.G. 2D1.1(c). The court then deducted two levels on the ground that Andino was a minor participant in the conspiracy, U.S.S.G. 3B1.2(b). Given a criminal history category of I, the guideline range was 151 to 188 months, and the district court imposed a sentence of 151 months. Andino now asserts that the court erred in several respects, firstly by attributing to him 506 grams of cocaine base sold by other defendants to Mersky on May 30, 1991, when Andino was neither present nor involved in the transaction. Individuals convicted of membership in a drug conspiracy are held responsible at sentencing not only for "drugs [they] personally handled or anticipated handling," but also, "under the relevant conduct rubric, for drugs involved in additional acts that were reasonably foreseeable by [them] and were committed in furtherance of the conspiracy." United States _____________ v. Sepulveda, 15 F.3d 1161, 1197 (1st Cir. 1993). In the _________ usual case, what is foreseeable depends on the scope of the defendant's agreement with the other participants in the criminal enterprise. United States v. Garcia, 954 F.2d 12, ______________ ______ 16 (1st Cir. 1992). Accordingly, the district court's task was to determine whether the May 30 transaction was reasonably foreseeable based upon the scope of Andino's agreement with his co-conspirators. Our review is only for clear error. United States v. De la Cruz, 996 F.2d 1307, 1314 _____________ __________ (1st Cir.), cert. denied, 114 S. Ct. 356 (1993). ____________ -20- -20- The record leaves little question that the May 30 sale was the "natural progression of the earlier series of sales," Garcia, 954 F.2d at 16, and thus within the scope of Andino's ______ agreement with his co-conspirators. True, the government's evidence did not mention Andino after May 16, but there is also no evidence that he affirmatively withdrew from the conspiracy. Nor is it conclusive that the May 30 transaction was larger than earlier transactions. In fact, co-defendant Quinones told Special Agent Mersky that the conspirators had other customers who bought in larger quantities than she did. Next, the district court found that Andino was a minor participant in the conspiracy and accordingly reduced his base offense level by two levels, pursuant to U.S.S.G. 3B1.2(b). In so doing, the court rejected Andino's argument that he was entitled to an even larger reduction as a minimal participant. See U.S.S.G. 3B1.2(a). Andino now renews ___ this argument on appeal, stressing his unfamiliarity with the English language and his absence at the group's largest transaction on May 30, 1991. The guidelines note that the "minimal participant" reduction should be "used infrequently," U.S.S.G. 3B1.2, application note 2, and the defendant has the burden of showing his entitlement to the reduction. United States v. _____________ Figueroa, 976 F.2d 1446, 1461 (1st Cir. 1992) cert. denied, ________ ____________ 113 S. Ct. 1346 (1993). Here, Andino was involved in at -21- -21- least four cocaine transactions and performed a number of different functions, including guarding the drugs, conducting counter-surveillance, and delivering cocaine base to Special Agent Mersky. Compare U.S.S.G. 3B1.2, application note 2 _______ (minimal participant "played no other role . . . than to offload part of a single marijuana shipment," or was a courier in "a single smuggling transaction"). We sustain the district court's finding that Andino's role was "minor" rather than something less. Last, the guidelines distinguish dramatically between cocaine and cocaine base (or "crack"), treating one gram of the latter as the equivalent of 100 grams of the former. Andino argues that the government's trial evidence failed to distinguish clearly between cocaine base and ordinary cocaine. He also claims that the jury's finding of cocaine base rests upon "untrustworthy evidence and faulty although well intended instruction[s]" by the court. Whether the substance distributed was cocaine or cocaine base was a matter to be determined by the district judge at sentencing, not the jury. United States v. Barnes, 890 F.2d _____________ ______ 545, 551 n.6 (1st Cir. 1989), cert. denied, 494 U.S. 1019 ____________ (1990). Under 21 U.S.C. 841(a), the jury need only find that the defendant distributed a substance containing some mixture of cocaine as defined in schedule II. Barnes, 890 ______ F.2d at 551 n.6; see 21 U.S.C. 812, 841(a). On appeal ___ -22- -22- from the sentence, we need only review the district court's sentencing determination that the substance involved was cocaine base. Barnes, 890 F.2d at 551 n.6. ______ Andino's argument is directed to the trial testimony of DEA chemist Florence Wong, who testified about the differences between ordinary cocaine and cocaine base. Although Wong did misspeak at one point in the transcript, her overall testimony was not confusing or misleading: it was that ordinary cocaine (cocaine hydrochloride) and cocaine base are distinct forms of the drug, and that the latter commonly goes by the street name of "crack"; that she had tested samples from each of the transactions involving the defendants; and that each sample contained cocaine base. Corroborated by recorded statements of Andino's co- defendants, and by field tests conducted by Mersky, Wong's testimony amply supports the district court's finding that the defendants distributed cocaine base. C. Martinez In sentencing Martinez, the district court began with a base offense level of 36 based on its finding that Martinez was accountable for 506 grams of cocaine base. The court granted a four-level reduction (because Martinez was a minimal participant in the conspiracy, U.S.S.G. 3B1.2(a)) and added two levels (because Martinez had obstructed justice by recklessly endangering others in fleeing from police, -23- -23- U.S.S.G. 3C1.2). Martinez's total offense level of 34, and his criminal history category of II, yielded a guideline range of 168 to 210 months' imprisonment. But because of his prior Connecticut drug conviction, Martinez was subject to a mandatory minimum sentence of 240 months, 21 U.S.C. 841(b)(1)(A); U.S.S.G. 5G1.1(b), which the district judge imposed. On appeal, Martinez makes three claims of error. First, although he was present at the May 30, 1991 transaction, Martinez complains on appeal that he could not have foreseen that there would be 506 grams of cocaine base involved. Martinez did not raise this argument below. Accordingly our review is only for plain error, Fed. R. Crim. P. 52(b); United States v. Colon-Pagan, 1 F.3d 80, 81 (1st Cir. 1993), ______________ ___________ a difficult assertion here since foreseeability is a fact- based inquiry. We have already determined that the evidence was sufficient to establish that Martinez was a member of the conspiracy who joined in its general objectives. It was entirely reasonable to infer that Martinez knew that a substantial quantity of drugs were to be sold on May 30. As we held in De la Cruz, "[a] defendant who conspires to ___________ transport for distribution a large quantity of drugs, but happens not to know the precise amount, pretty much takes his chances that the amount actually involved will be quite -24- -24- large." 996 F.2d at 1314. Second, Martinez claims that there is an unfair disparity between his sentence and those meted out to his co- defendants. We have held that at least in the ordinary case, "[t]he guidelines do not require the sentencing court to consider related cases or to justify a sentence in terms of the punishment meted out to co-defendants." United States v. _____________ Font-Ramirez, 944 F.2d 42, 50 (1st Cir. 1991), cert. denied, ____________ ____________ 112 S. Ct. 954 (1992). In this case, moreover, Martinez's sentence was wholly determined by a mandatory minimum prescribed by statute. See 21 U.S.C. 841(b)(1)(A). ___ Martinez's final claim is a vague and perfunctory collection of challenges to the validity of the sentencing guidelines under the heading "Sentencing is Impermissibly Draconian." Martinez does not explain in what way the sentencing guidelines are inflexible or what mitigating circumstances they have failed to reflect in this case. In any event, Martinez's sentence was determined by a statutory minimum sentence for defendants in Martinez's circumstances and any alleged inflexibility in the guidelines is irrelevant. Martinez's further argument--that the Constitution provides a right to "punishment that fits the crime"--is resolved by Harmelin v. Michigan, 111 S. Ct. 2680 (1991). ________ ________ That decision upheld, against a proportionality challenge, a -25- -25- state regime imposing a mandatory sentence of life without parole for possessing more than 650 grams of cocaine. See ___ also United States v. Lowden, 955 F.2d 128, 131 (1st Cir. ____ _____________ ______ 1992) (upholding, under Harmelin, a sentence of seven years ________ for distribution of 7.7 grams of LSD). Conspiracy to distribute a large quantity of cocaine base is a serious crime, the more so when committed by a prior offender. Given Harmelin, we cannot say that Martinez's sentence was ________ unconstitutionally excessive. -26- -26- D. Quinones In sentencing Quinones, the district court began with a base offense level of 36, based on a finding that he was accountable for 896.2 grams of cocaine base. The court then added three levels on account of Quinones' managerial role in the conspiracy. U.S.S.G. 3B1.1(b). The resulting offense level of 39, along with Quinones' criminal history category of IV, yielded a guideline range of 360 months to life. The court sentenced Quinones at the bottom of that range. Quinones now challenges the district court's decisions as to his role in the offense and the amount of drugs for which he should be held accountable. Section 3B1.1(b) of the guidelines provides that "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase [the base offense level] by 3 levels." Quinones does not dispute that the conspiracy in this case involved at least five participants; he argues, however, that he did not play a managerial role. The government had the burden at sentencing of proving by a preponderance of the evidence that an upward adjustment was warranted. United States v. Ortiz, 966 F.2d _____________ _____ 707, 717 (1st Cir. 1992), cert. denied, 113 S. Ct. 1005 _____________ (1993). Despite Quinones' assertion that he was merely "a foot soldier" like Martinez and Andino, we think that there -27- -27- was sufficient evidence to sustain the district court's finding. Special Agent Mersky testified that Delgado, the acknowledged ringleader of the conspiracy, introduced Quinones to her as his "partner." Moreover, the district court found that Quinones had exercised supervisory control over Andino at the abortive transaction on May 3. Quinones' action in renegotiating the price of the drugs at the more successful May 6 transaction also suggests a position of authority. Quinones rightly points out that one can imagine more than one explanation for all of these events, but we think that the view taken by the district court is not implausible. United States v. Savoie, 985 F.2d 612, 616 (1st Cir. 1993) ______________ ______ (sentencing court's choice between two plausible views of the record cannot be clearly erroneous). Additionally, we have said that "[m]anagerial status may attach if there is evidence that a defendant, in committing the crime, exercised control over, or was otherwise responsible for overseeing the activities of, at least one other person." Id. The ___ imposition of the sentence enhancement here was not clear error. Like Andino, Quinones was not present at the May 30, 1991 transaction and thus claims that he should not have been held accountable for the 506 grams of cocaine base involved in that transaction. As we have noted above, there was -28- -28- considerable evidence at trial that Quinones played a prominent role in the conspiracy, making it reasonable to infer that Quinones was well-acquainted with the scope of the group's activities and plans. Quinones does not argue that he had withdrawn from the conspiracy prior to May 30. Accordingly, we uphold the district court's determination that Quinones was accountable for the full amount of cocaine base distributed over the life of the conspiracy. Appellants' convictions and sentences are affirmed. ________ -29- -29-